The AETNA CASUALTY AND SURETY COMPANY, a corporation,

v.

The UNITED STATES.

Curtis JOHNSON, etc.

v.

The UNITED STATES.

Nos. 454–79C, 455–79C.

United States Court of Claims.

June 17, 1981.

Conrad L. Squires, Los Angeles, Cal., for plaintiff in 454–79C; John W. Heinemann, Los Angeles, Cal., attorney of record. Haase & Heinemann, Los Angeles, Cal., of counsel.

John W. Heath, Jr., Los Angeles, Cal., attorney of record, for plaintiff in 455–79C.

Robert G. Giertz, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant. Ray Goddard, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHI-WA, Judges.

## ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

KASHIWA, Judge.

These consolidated cases come before the court on cross motions for summary judgment after transfer from a district court. We must decide whether the plaintiffs, a construction company and its surety, may sue the United States for their alleged losses in completing a federally insured housing project. After consideration of the parties' written and oral submissions, we dismiss these petitions.

Plaintiff Curtis Johnson (Johnson) is a construction company. Johnson substantially completed a housing project known as the University Gardens project under a construction contract with the owner, the Hoover Interfaith Housing Corporation (Hoover). Johnson brings this action to recover $278,483 (plus attorneys' fees and costs) supposedly owed it for work done under the contract with Hoover.

Plaintiff Aetna Casualty and Surety Company (Aetna) provided Johnson with performance and payment bonds to be given Hoover and Pacific Mutual Life Insurance Company (Pacific) (Hoover's lender) to ensure Johnson's contract performance. Aetna brings this action as subrogee to recover funds which it paid Johnson's subcontractors and materialmen when Johnson became unable to make the required payments. Aetna seeks recovery in the amount of $152,350.49 plus interest. This amount represents $118,160.51 paid by Aetna to subcontractors and materialmen and $34,189.98 in attorneys' fees and costs. Alternatively, Aetna claims entitlement to an unpaid final progress payment and certain retainages aggregating $150,542 (plus interest).

The financing for the University Gardens project was insured by the Department of Housing and Urban Development (HUD) pursuant to the National Housing Act.[1] Under the relevant provisions,[2] HUD insured 100 percent of a secured construction loan (the mortgage) between Hoover (a

[1]. The statutory framework, presently codified at 12 U.S.C. §§ 1701 et seq. (1976), was first enacted in 1934 as the National Housing Act, ch. 847, 48 Stat. 1246 (1934). For simplicity's sake, we refer hereafter to the statutory framework as if it were contained in a single act of Congress. Subsequent references to the United States Code indicate, except as noted, the 1970 version.

[2]. The particular provisions under which this project was built, section 236 of the Act (12 U.S.C. § 1715z–1), were first added by Title II, section 201(a), of the Housing and Urban Development Act of 1968, Pub.L. 90–448, 82 Stat. 476 (1968). Section 236 was added to make rental housing more available to low income families. The section 236 aspects of this project are not directly in issue here. Rather,

this litigation is concerned with the rights of the builder and its surety against the United States. Although this controversy focuses on the consequences of default assignment under 12 U.S.C. § 1713(g) (made applicable to section 236 projects by 12 U.S.C. § 1715z–3(a)(2)), similar concerns arise in a variety of HUD housing programs. E. g., Housing Corp. of America v. United States, 199 Ct.Cl. 705, 468 F.2d 922 (1972); Correlated Development Corp. v. United States, 214 Ct.Cl. 106, 556 F.2d 515 (1977); Peoples Apparel, Ltd. v. United States, Ct.Cl., 650 F.2d 291 (1980); H. A. Ekelin & Assocs. v. United States, Ct.Cl., 650 F.2d 289 (1980); C. P. Squire Contractors, Inc. v. United States, Ct.Cl. No. 457–77 (order entered July 25, 1980); Beco, Inc. v. United States, 214 Ct.Cl. 820 (1977); Azer v. United States, 204 Ct.Cl. 898 (1974).

non-profit private corporation created to own the resulting low-income housing) and Pacific (the commercial lender). Separate agreements were executed between these multiple parties, including the construction contract between Johnson and Hoover, the Building Loan Agreement and other financing arrangements between Hoover and Pacific, a mortgage insurance agreement between Pacific and HUD, and a regulatory agreement (detailing property management and like concerns) between HUD and Hoover. As a practical matter, HUD was intimately involved with all details of the project from its inception.

Normally, amortization of section 236 project mortgages begins after the project is occupied. Interest on the construction loan is incorporated into the principal of the section 236 mortgage, and thus, owners undertaking such projects need little, if any, operating capital. Section 236 owners are generally non-profit, private corporations formed to hold formal title to the property. Should default on the mortgage occur, the mortgagee has the option of assigning the mortgage to HUD and receiving reimbursement of all approved advances, plus interest. Other options are also available to the mortgagee, including renegotiation of the loan, foreclosure, or accepting voluntary conveyance of the property.

Under the construction contract, the contractor receives progress payments as expenses are incurred. Payment requests are submitted to the non-profit owner, who in turn requests corresponding mortgage proceeds. Assuming the loan is in balance, i. e., remaining loan proceeds equal or exceed costs of completion (including those for delivered materials and rendered services), the lender and HUD approve the advance, less a 10 percent retainage. The reduced advance is made to the owner and, ultimately, the contractor. The retainages are payable after the project is complete, state and local occupancy certification occurs, and HUD approves.[3]

Construction of this project was substantially complete by December 2, 1971. Various local authorities and HUD approved the project for occupancy shortly thereafter. However, at that time the remaining mortgage proceeds were apparently inadequate to cover remaining costs.[4] Pacific, with HUD's approval, therefore withheld disbursement of the final progress payment ($17,162) and the retainages ($133,380)

**3.** Subparagraphs 4(b) and (e) of the Building Loan Agreement provide:

"(b) Upon completion of the improvements, including all landscape requirements and off-site utilities and streets, the Borrower shall furnish to the Lender and the Commissioner satisfactory evidence that all work requiring inspection by municipal or other governmental authorities having jurisdiction has been duly inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction; and that all requisite certificates of occupancy and other approvals have been issued. The balance due the Borrower hereunder shall be payable at such time after completion as the commissioner authorizes the release of the holdback. However, the Lender may withhold final payment until after the expiration of any period which mechanics and materialmen may have for filing liens."

"(e) The Borrower agrees that the loan shall at all times remain in balance. The Lender shall, in accordance with the provisions of this agreement, continue to advance to the Borrower funds out of the proceeds of the loan as long as the loan remains in balance and the Borrow-

er is not in default hereunder or under the Note or Mortgage. The loan shall be deemed to be in balance only when the undistributed proceeds of the loan (after provision for reserves, fees, expenses and other deposits required by the Lender or the Commissioner) equal or exceed the amount necessary (based on the Commissioner's estimate of the cost of construction) to pay for all work completed and all materials delivered, for which payment has not been made, and the cost of completing construction of the project in accordance with the Drawings and Specifications."

**4.** Remaining loan proceeds were apparently $156,652.18. Johnson's remaining costs are not clear from the record. One affidavit suggests remaining costs were approximately $215,268. The arbitration award of $272,358 (exclusive of costs) suggests the remaining costs were somewhat higher. The plaintiffs appear to concede the loan was in fact out of balance but argue the imbalance was a technicality and should have been disregarded and the loan amount increased.

pending settlement of the unpaid costs.[5] Thereafter, although the project was at least partially occupied, Hoover defaulted on the amortization, although the exact date of technical default is unclear from this record. Negotiations followed without result. Johnson filed a mechanic's lien under California law on the property. Also during this period, Johnson was unable to pay the materialmen and subcontractors. As surety, Aetna paid the subcontractors and materialmen. Pursuant to an arbitration clause in the construction contract, Johnson was awarded $272,358 (plus costs) against Hoover. In early 1973 Hoover sought proceedings under Chapter 11 of the Bankruptcy Act of 1898, formerly 11 U.S.C. §§ 701 *et seq.* Hoover was formally declared in default on the mortgage in August 1973, and thereafter, the mortgage was assigned to HUD. HUD ultimately foreclosed the mortgage.

Eventually, district court litigation in the Ninth Circuit ensued between Aetna, Johnson, Hoover, Pacific, and HUD. Judgment was entered for Aetna against Johnson totaling $203,958.88. However, the district appeals court determined under *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co.,* 595 F.2d 1126 (9th Cir. 1979), that the actions against HUD were in reality against the United States and in excess of the $10,000 Tucker Act limit on such actions in the district courts. See 28 U.S.C. § 1346(a)(2) (1976). The reformed actions were transferred to this court under 28 U.S.C. § 1406(c) (1976) and consolidated. These cross motions for summary judgment followed.

█ These suits, of course, are proper only insofar as the United States has waived its sovereign immunity and consented to suit. *See United States v. Mitchell,*

445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Waivers of the immunity "cannot be implied, but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). Similarly, any waiver must be strictly construed. *See, e. g., Schillinger v. United States,* 155 U.S. 163, 167–169, 15 S.Ct. 85, 86–87, 39 L.Ed. 108 (1894); *Minnesota v. United States,* 305 U.S. 382, 388–389, 59 S.Ct. 292, 295–296, 83 L.Ed. 235 (1939). Thus, except as Congress has expressly consented, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." *United States v. Sherwood, supra* 312 U.S. at 587–588, 61 S.Ct. at 770–771.

█ The Tucker Act, 28 U.S.C. § 1491 (1976), is the general Congressional consent to suit in this court. Under the Tucker Act, suit in this court is proper only as to actions "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Transfer of this case from the district court does not found jurisdiction here, *Berdick v. United States,* 222 Ct.Cl. ——, ——, 612 F.2d 533, 536 (1979), and if these claims are not within one of the categories enumerated by the Tucker Act, the petitions must be dismissed. Several theories are advanced to support jurisdiction.

---

**5.** These sums aggregate $150,542. The difference between this sum and the remaining loan proceeds (*supra* note 4) is apparently attributable to other construction period costs of Hoover. Under our holding, we need not decide whether the plaintiffs' recovery should be limited to the lesser amount; and we assume *arguendo* that plaintiffs are the only creditors of Hoover. Thus, textual references to the undis-

bursed mortgage or loan proceeds indicate the entire $156,652.18, which was committed by Pacific but never paid.

No disbursement of either the final progress payment or retainages has ever occurred as the loan has allegedly been out of balance or in default since December 2, 1971. See note 3, *supra;* note 16, *infra.*

## EXPRESS OR IMPLIED CONTRACT

Plaintiffs [6] begin by conceding that Johnson's construction contract was with Hoover, not the United States. Nevertheless, plaintiffs argue, the United States has implicitly contracted with Johnson to provide this low-cost housing. Hoover, plaintiffs say, was in reality a "creature of HUD," that is, a corporate shell (with grossly inadequate capital) created exclusively to facilitate this project. All parties, plaintiffs continue, were aware HUD was the true source of capital. HUD drafted all relevant documents. HUD approved all mortgage advances. HUD required all work to be of a certain quality. In short, HUD conceived, implemented, and supervised this project in intimate detail to effect the statutory goal of rental housing for the nation's poor. These facts, the argument goes, require this court to disregard the contracting intermediaries, Hoover and Pacific, and to conclude a contract existed between the United States and Johnson on which plaintiffs can sue.

■ We cannot agree. Plaintiffs' allegations are but the most recent in a litany of cases [7] where those indirectly associated with a dispensation of the federal largess have sought to recover an assortment of damages from the Government. It is well-settled, however, that where the United States does not make itself a party to the contracts which implement important national policies, no express or implied contracts result between the United States and those who will ultimately perform the work. This doctrine is hardly novel, for its roots date to *Jones v. United States*, 1 Ct.Cl. 383 (1865). It was first clearly enunciated in *D. R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967), a case involving construction of a federal highway.

In *D. R. Smalley*, we concluded there was no jurisdiction in this court over the plaintiff contractor's suit against the United States for the plaintiff's contracts had been with the State of Ohio and not the Federal Government:

> * * * The defendant did not sign the contracts with the plaintiff and there were no negotiations or communications whatsoever between them. Consequently, there were no express contracts between them.
>
> The same reasoning applies to plaintiff's alternative claim that defendant is liable because of implied contracts with plaintiff. The sovereign acts of defendant described above do not impose liability on defendant for the acts and omissions of the State of Ohio on the theory of implied contract. The contracts were between the state and plaintiff.
>
> Accordingly, since there was no privity of contract, express or implied, between plaintiff and defendant, the defendant is not liable in contract for the damages claimed by plaintiff. [178 Ct.Cl. at 598, 372 F.2d at 508.]

We have since applied the *D. R. Smalley* doctrine in a variety of circumstances where Government agencies (including HUD) use other entities to contract for the general welfare, notwithstanding the Government's intimate involvement with all

---

**6.** To a large extent, there is an identity of interest between these plaintiffs. Aetna's rights against the United States (if any) are derived from Johnson through subrogation. Moreover, as the plaintiffs conceded at oral argument, Aetna's position as judgment creditor of Johnson has the practical effect of making a judgment for Johnson in reality one for Aetna, at least to the extent of $203,958.88. As we dismiss both petitions, we need not apportion recovery between these plaintiffs, nor need we distinguish between the arguments each makes. We therefore refer to Johnson and Aetna simply as the plaintiffs.

**7.** *E. g.*, cases collected at note 2, *supra*; *Somerville Technical Services v. United States*, 640 F.2d 1276, Ct.Cl. No. 217–79C (slip op. of January 28, 1981); *Porter v. United States*, 204 Ct.Cl. 355, 496 F.2d 583 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *Velez v. United States*, Ct.Cl. No. 146–80C (order entered March 27, 1981); *Trus Joist Corp. v. United States*, 208 Ct.Cl. 979 (1975). *See also City of Manassas Park v. United States*, 224 Ct.Cl. ——, 633 F.2d 181, *cert. denied*, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980).

stages of a project. Such intimate involvement, were the United States not acting as sovereign, might require reformation of the contract or a conclusion that a contract should be implied in fact. Nevertheless, the sovereign nature of the acts insulates the United States from liability. For example, in *Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 468 F.2d 922, and *Correlated Development Corp. v. United States*, 214 Ct.Cl. 106, 556 F.2d 515, the plaintiff contractors had contracted with local housing authorities (LHAs) to construct and sell housing projects to the LHAs. Funds for the projects were received from the Federal Government under annual contributions contracts. Although HUD was not a party to the contracts between the LHAs and the plaintiffs, those contracts were subject to approval by HUD officials; the construction contracts referenced the annual contributions contracts between HUD and the LHAs; closing documents were prepared by HUD; HUD approved the plans and specifications, as well as any changes in the contract price; and HUD construction representatives inspected the work as it progressed. The plaintiffs in both cases contended, as do plaintiffs here, that the Government made itself a party to the contracts by its dominant control and supervision of every phase. In *Housing Corp. of America*, 199 Ct.Cl. at 710, 468 F.2d at 924, we rejected such claims:

> The contract here in issue is one of many pursuant to which the Federal Government subsidizes projects of state and local authorities for the public betterment. The United States, however, does not make itself a party to the contracts relating to said projects but obligates itself by separate agreements, as here, to local authorities for the funding of those projects it approves. The significance of that approval is spelled out here in Article IX. This does not create an express or implied contract between plaintiff and defendant nor does it make the Commission defendant's agent through HUD. HUD's actions were performed in defendant's capacity as sovereign. This principle has been settled for some time by a similar case involving construction under the Federal-Aid Highways Act. *D. R. Smalley & Sons v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). The *Smalley* case is squarely in point.

Relying on *Housing Corp. of America*, *Correlated Development Corp.* reached a similar result.[8] More recently, in *H. A. Ekelin & Assocs. v. United States*, 650 F.2d 289 (1980), we extended the *D. R. Smalley* rationale to HUD mortgage insurance provisions similar to those involved here. We concluded in *H. A. Ekelin* that although HUD was intimately involved in all phases of a housing project under section 231 of the Act (12 U.S.C. § 1715v), provision of mortgage insurance including eventual default assignment under 12 U.S.C. § 1713(g) was a sovereign act within the purview of *D. R. Smalley*.[9]

We see no reason to reach a different result today as to the mortgage insurance for section 236 projects, and we reaffirm the *H. A. Ekelin* holding. Therefore, HUD's acts in insuring this project (including accepting default assignment) do not

---

8. The major difference between the cases was plaintiff's assertion in *Correlated Development Corp.* that section 13 of the annual contributions contract between HUD and the LHAs allowed the plaintiff contractor a direct action against the United States. The issue had not been raised in *Housing Corp. of America*. The majority opinion in *Correlated Development Corp.* held section 13 inapplicable as the changes ordered by LHA were not among the listed contingencies invoking the section. The concurring opinion suggested the changes ordered by LHA were seemingly within a broad reading of section 13 but that other considera-

tions required a more circumspect reading, precluding suit.

9. *H. A. Ekelin* also rejected the contractor's contention that it could, as an alleged third-party beneficiary, enforce the Building Loan Agreement. That contention, however, was rejected on the ground that the lender had completely disbursed the mortgage proceeds. Thus, *H. A. Ekelin* did not (and could not) reach the issue we are compelled to discuss *infra*, plaintiffs' claimed right as third-party beneficiaries to compel disbursement of the unpaid loan proceeds.

create either express or implied contracts between Johnson and defendant.[10]

## THIRD–PARTY BENEFICIARY

The plaintiffs next claim entitlement to the undisbursed mortgage proceeds as third-party beneficiaries to the mortgage agreement. Plaintiffs focus on the language in 12 U.S.C. § 1713(g),[11] which provides "the mortgagee shall be entitled to receive the benefits of the insurance * * * upon assignment, transfer, and delivery to the Secretary * * * of * * * all rights and interests arising under the mortgage so in default * * *." Plaintiffs contend that as an assignment has occurred, the United States is therefore a "mortgagee" under the definition of 12 U.S.C. § 1713(a)(2).[12] Thus, plaintiffs continue, Congress intended the United States to become liable *as a successor mortgagee on the mortgage agreement.*

Plaintiffs' argument concludes that the United States can be compelled by either the mortgagor or third-party beneficiaries to the mortgage agreement to pay undisbursed mortgage proceeds.

The plaintiffs are, we think, wrong. The critical inquiry is the scope of the "assignment, transfer, and delivery" required in 12 U.S.C. § 1713(g), that is, whether Congress intended the United States to be liable in the same manner a private successor mortgagee would for undisbursed proceeds. That Congress recognized default assignment might occur when mortgage proceeds were undisbursed is beyond doubt, for 12 U.S.C. § 1713(g)(4) requires the then mortgagee to deliver to the Secretary "any balance of the mortgage loan not advanced to the mortgagor." Yet there is no corresponding provision obligating the United

**10.** The presence of undisbursed mortgage proceeds does not in itself alter our conclusion that these were sovereign acts, especially in light of the explicit recognition in 12 U.S.C. § 1713(g)(4) that all undisbursed proceeds must be forwarded to HUD as a part of assignment. See also notes 11–16 and accompanying text, *infra.* Accepting assignment of a mortgage with undisbursed proceeds on these facts is no less a sovereign act than accepting assignment of a mortgage without such proceeds, although the *equities* of a plaintiff's claim may be thereby increased. Of course, our conclusion that no contract results between the sovereign and these plaintiffs does not necessarily preclude plaintiffs from proceeding on other theories to recover the loan proceeds.

**11.** 12 U.S.C. § 1713(g) provides in relevant part:

"(g) The failure of the mortgagor to make any payment due under or provided to be paid by the terms of a mortgage insured under this section shall be considered a default under such mortgage and, if such default continues for a period of thirty days, the mortgagee shall be entitled to receive the benefits of the insurance as hereinafter provided, upon assignment, transfer, and delivery to the Secretary, within a period and in accordance with rules and regulations to be prescribed by the Secretary of (1) all rights and interests arising under the mortgage so in default; (2) all claims of the mortgagee against the mortgagor or others, arising out of the mortgage transactions; (3) all policies of title or other insurance or surety bonds or other guaranties and any and all claims thereunder; (4) any balance of the mortgage loan not advanced to the mortgagor; (5) any cash or prop-

erty held by the mortgagee, or to which it is entitled, as deposits made for the account of the mortgagor and which have not been applied in reduction of the principal of the mortgage indebtedness; and (6) all records, documents, books, papers, and accounts relating to the mortgage transaction. Upon such assignment, transfer, and delivery the obligation of the mortgagee to pay the premium charges for mortgage insurance shall cease, and the Secretary shall, subject to the cash adjustment provided for in subsection (j) of this section, issue *to the mortgagee a certificate of claim as provided in subsection (h) of this section, and debentures having a total face value equal to the original principal amount of the mortgage * * *.*"

**12.** 12 U.S.C. § 1713(a)(2) provides:

"The term 'mortgagee' means the original lender under a mortgage, and its successors and assigns, and includes the holders of credit instruments issued under a trust mortgage or deed of trust pursuant to which such holders act by and through a trustee therein named."

It is by no means certain that the 12 U.S.C. § 1713(a)(2) definition of mortgagee should apply to the post-default assignment of a mortgage insured under § 236 of the Act. See 12 U.S.C. §§ 1715z–1(j)(2)(C) and 1715z–3(a)(2) (second sentence), which together indicate the relevant definition is that of 12 U.S.C. § 1707(b). That definition, if anything, provides further support for our conclusion for it requires the Secretary to approve all successor mortgagees. The provision suggests that a successor mortgagee is someone other than the Secretary.

States to pay those undisbursed proceeds to the defaulting mortgagor. Indeed, 12 U.S.C. § 1713(k) [13] suggests a contrary conclusion for that section authorizes the Secretary to exercise only the *rights* of a mortgagee. Similarly, 12 U.S.C. § 1713(*l*) [14] mentions only the "power * * * to pay * * all expenses or charges in connection with * * * any property acquired by [the Secretary] under this section" and the "power to pursue * * * all claims assigned and transferred to [the Secretary] * * * in connection with the assignment, transfer, and delivery provided for in this section * * *." The implication, of course, is that although such proceeds are clearly to be given to the Secretary, there is no *enforceable legal duty* to disburse those proceeds. Plaintiffs' inventive use of the statutory definition of mortgagee to create such a duty is not supported elsewhere in the statute, for the subsections of 12 U.S.C. § 1713 detailing post-default rights and consequences refer separately to the mortgagee and the Secretary. *See, e. g.,* 12 U.S.C. § 1713(g), (h), (j), (k), and (*l*). Leaving aside § 1713(a)(2), we simply find nothing in the statute to support plaintiffs' contentions that the use of distinct terms should be ignored and an obligation to pay these proceeds found. The better reading of 12 U.S.C. § 1713(a)(2) is to limit that definition to mortgagees who obtain the mortgage other than through post-default "assignment, transfer, and delivery" under 12 U.S.C. § 1713(g).

Nor does the legislative history support plaintiffs' contention that Congress intended 12 U.S.C. § 1713 as a consent to suit over undisbursed mortgage proceeds. That section was added as section 207 of the National Housing Act by section 3, National Housing Act Amendments of 1938, ch. 13, 52 Stat. 8. Our research of the legislative history of section 3 discloses no intent to obligate the United States to disburse any unpaid mortgage proceeds acquired after default. Indeed, testimony at both the House and Senate Committee Hearings by the Federal Housing Administrator indicated that the purpose of allowing the mortgage to be assigned (in lieu of the mortgagee acquiring title and then assign-

---

**13.** 12 U.S.C. § 1713(k) provides:

"(k) The Secretary is authorized either to (1) acquire possession of and title to any property, covered by a mortgage insured under this section and assigned to him, by voluntary conveyance in extinguishment of the mortgage indebtedness, or (2) institute proceedings for foreclosure on the property covered by any such insured mortgage and prosecute such proceedings to conclusion. The Secretary at any sale under foreclosure may, in his discretion, for the protection of the General Insurance Fund, bid any sum up to but not in excess of the total unpaid indebtedness secured by the mortgage, plus taxes, insurance, foreclosure costs, fees, and other expenses, and may become the purchaser of the property at such sale. The Secretary is authorized to pay from the General Insurance Fund such sums as may be necessary to defray such taxes, insurance, costs, fees, and other expenses in connection with the acquisition or foreclosure of property under this section. Pending such acquisition by voluntary conveyance or by foreclosure, *the Secretary is authorized, with respect to any mortgage assigned to him under the provisions of subsection (g) of this section, to exercise all the rights of a mortgagee under such mortgage,* including the right to sell such mortgage, and to take such action and advance such sums as may be necessary to preserve or protect the lien of such mortgage." [Emphasis supplied.]

**14.** 12 U.S.C. § 1713(*l*) provides:

"(*l*) Notwithstanding any other provisions of law relating to the acquisition, handling, or disposal of real and other property by the United States, the Secretary shall also have power, for the protection of the interests of the General Insurance Fund, to pay out of the General Insurance Fund all expenses or charges in connection with, and to deal with, complete, reconstruct, rent, renovate, modernize, insure, make contracts for the management of, or establish suitable agencies for the management of, or sell for cash or credit or lease in his discretion, any property acquired by him under this section; and notwithstanding any other provision of law, the Secretary shall also have power to pursue to final collection by way of compromise or otherwise all claims assigned and transferred to him in connection with the assignment, transfer, and delivery provided for in this section, and at any time, upon default, to foreclose on any property secured by any mortgage assigned and transferred to or held by him: *Provided,* That section 5 of Title 41 shall not be construed to apply to any contract for hazard insurance, or to any purchase or contract for services or supplies on account of such property if the amount thereof does not exceed $1,000."

ing the underlying property) was merely to place the United States in possession of the property more quickly.[15]

█ Thus, notwithstanding the statutory requirement that an "assignment" of the mortgagee's interest occur, we think it inappropriate to conclude that Congress intended the United States to become bound thereby to disburse any unpaid mortgage proceeds. *Cf. United States v. Mitchell*, 445 U.S. at 541–544, 100 S.Ct. at 1353–1355 (the statutory term "trust" must be read in conjunction with the remainder of the statute and legislative history to define obligations of the United States). It follows that if the United States is not liable to disburse the mortgage proceeds, plaintiffs have no third-party beneficiary claim, whether founded on California law or otherwise, within our jurisdiction.[16]

## REGULATIONS

The plaintiffs advance a similar contention regarding the mortgagee's regulatory duty to disburse all mortgage proceeds. In essence, the plaintiffs argue that the United States, as assignee of the mortgage, became a successor mortgagee under 12 U.S.C. § 1713(a)(2). At the time of the assignment, a mortgagee was required by 24 C.F.R. § 221.512 (1973)[17] to disburse

> * * * as a part of the mortgage transaction * * * the principal amount of the mortgage, to, or for the account of the mortgagor or *to his creditors* for his account and with his consent. [Emphasis supplied.]

Plaintiffs rely on the emphasized portion, claiming entitlement to the mortgage proceeds as creditors of Hoover. Plaintiffs are wrong for several reasons.

█ As we have already discussed, the Secretary does not under the statute become a successor mortgagee with a duty of disbursement. Plaintiffs' application of the mortgagee's regulatory duty to disburse is therefore incorrect. Even were the statute

---

15. *Proposed Amendments to the National Housing Act, Hearings on H.R. 8520 Before the House Committee on Banking and Commerce,* 75th Cong., 2d Sess. 13 (1937) (testimony of Stewart McDonald, Federal Housing Administrator); *Proposed Amendments to the National Housing Act, Hearings on S. 3055 Before the Senate Committee on Banking and Currency,* 75th Cong., 2d Sess. 16 (1937) (same). *See also* H.R.Rep.No.1655, 75th Cong., 2d Sess. 4 (1937); S.Rep.No.1300, 75th Cong., 2d Sess. 7 (1937).

16. We need not, therefore, reach defendant's further contentions that California law does not allow general contractors to claim third-party beneficiary status as to construction financing agreements. *See Gordon Bldg. Corp. v. Gibraltar Sav. and Loan Ass'n,* 247 Cal.App.2d 1, 55 Cal.Rptr. 884 (1966). Nor need we reach the related contention that subparagraph 4(e), *supra* note 3, of the Building Loan Agreement prevents Hoover (and these plaintiffs) from compelling disbursement as the loan has allegedly been out of balance or in default at all relevant times.

We note that other decisions, for example, *Trans-Bay Eng'rs & Bldrs., Inc. v. Hills,* 551 F.2d 370 (D.C.Cir.1976), and *Travelers Indem. Co. v. First Nat'l State Bank of N. J.,* 328 F.Supp. 208 (D.N.J.1971), have assumed or concluded that the Secretary can be compelled to disburse unpaid mortgage proceeds by those claiming as third-party beneficiaries to the Building Loan Agreement. The differing result may be explained in part in that none of those cases were concerned with this issue as a jurisdictional matter, *i. e.,* jurisdiction *over the Secretary* was present under statutes other than the Tucker Act. Those cases, instead, used the statute and the various agreements to define substantive rights of parties properly before those courts. We, of course, must approach the jurisdictional issue with more constraint and therefore decline to follow the reasoning of those cases. See also discussion *infra* at page 1059.

17. Subsequent references to the Code of Federal Regulations (C.F.R.) also indicate the 1973 edition, except as noted. The plaintiffs cite 24 C.F.R. § 207.3(b) as the source of the mortgagee's duty to completely disburse. The regulations governing section 236 projects are contained in Part 236 of C.F.R. Title 24, 24 C.F.R. §§ 236.1 *et seq.* Subpart A covers eligibility requirements and by cross reference in 24 C.F.R. § 236.1 incorporates (with listed exceptions) 24 C.F.R. §§ 221.502–221.749. Subpart B covers contract rights and obligations for mortgage insurance and by cross reference in 24 C.F.R. § 236.251 incorporates (with listed exceptions) 24 C.F.R. §§ 207.251–207.499. Thus, it would appear 24 C.F.R. § 221.512, not 24 .C.F.R. § 207.3(b), requires the disbursement of all mortgage proceeds insured under section 236 of the Act. Similarly, 24 C.F.R. § 207.251 provides applicable definitions.

less clear, the regulations themselves negate the conclusion plaintiffs would have us reach. First, the regulations governing section 236 projects contain their own definition of mortgagee in 24 C.F.R. § 207.251(g):

> (g) The term "mortgagee" means the original lender under a mortgage, its successors and such of its assigns as are approved by the Commissioner, and includes the holders of the credit instruments issued under a trust indenture, mortgage or deed of trust pursuant to which such holders act by and through a trustee therein named.

That regulation also contains a separate definition for the Secretary's representative, the Federal Housing Commissioner. See 24 C.F.R. § 207.251(a). No mention is made of the Commissioner as a mortgagee, and as the Commissioner must approve any successor mortgagee, see also 24 C.F.R. § 207.261, the implication is that a mortgagee is one other than the Commissioner. Moreover, consistently throughout the regulations, and including the provisions discussing default assignment, 24 C.F.R. §§ 207.-255–207.259, the distinct terms "Commissioner" and "mortgagee" are used in contrast to each other. Given the precise use of these terms, we can hardly infer that the terms "Commissioner" and "mortgagee" become interchangeable, as plaintiffs' reading requires.

Second, those who drafted the regulations establishing the default procedures in 24 C.F.R. § 207.255 *et seq.* were aware (as was Congress, *supra*) that mortgages with undisbursed proceeds might be assigned to the Commissioner. See 24 C.F.R. § 207.-258(b)(4)(i). Had the drafters thought the United States bound as a successor mortgagee to disburse those proceeds, it is surprising they would fail to include either a provision to that effect or a cross reference to the mortgagee's disbursement duty. Yet there is none.

In light of these considerations, we conclude that the plaintiffs have no claim founded on the regulations.

## MECHANIC'S LIEN

■ The plaintiffs argue that under California law they have a valid mechanic's lien against the University Gardens property. See Cal.Civ.Code § 3110 (West 1974). Plaintiffs theorize that as the United States has foreclosed the mortgage and now owns the property, that lien may be enforced against the United States. Plaintiffs' arguments, however, ignore the long-settled rule that liens such as Johnson claims are not enforceable against the United States or its property. *Armstrong v. United States*, 364 U.S. 40, 46 & n.4, 80 S.Ct. 1563, 1567 & n.4, 4 L.Ed.2d 1554 (1960), and cases cited; *J. F. Hodgkins Co. v. United States*, 162 Ct.Cl. 40, 43, 318 F.2d 932, 934 (1963). Plaintiffs have thereby overlooked what may be their strongest claim, viz., that because a once-valid lien has been made unenforceable, the United States has taken a property interest so as to require Fifth Amendment compensation. *See Armstrong, supra* at 44–49, 80 S.Ct. at 1566–1569; *J. F. Hodgkins, supra* at 43, 318 F.2d at 934; *J. J. Henry Co. v. United States*, 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969). The relevant inquiries are whether Johnson had an enforceable lien which became unenforceable and if so, whether foreclosure of the mortgage amounts to a Fifth Amendment taking.

We need only reach the question of whether Johnson has an enforceable lien under California law. Article VII of the construction contract between Johnson and Hoover provides:

> The Contractor shall file no mechanic's or materialman's lien or maintain any claim against the Owner's real estate or improvements for or on account of any work done, labor performed or materials furnished under this Contract.

The provision clearly purports to waive Johnson's lien rights.

■ Mechanic's liens in California are entirely creatures of statute. *Holm v. Bramwell*, 20 Cal.App.2d 332, 67 P.2d 114 (1937). California Civil Code § 3268 (West 1974) allows lien rights to be waived and provides:

Except where it is otherwise declared, the provisions of the foregoing titles of this part, in respect to the [lien] rights and obligations of parties to contracts, are subordinate to the intention of the parties, when ascertained in the manner prescribed by the chapter on the interpretation of contracts; and the benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy.

Although our research has disclosed no California authority squarely holding that such clauses in construction agreements are consistent with public policy, we have little doubt the Article VII waiver would be held valid.

California statutory law does contain a provision, Cal.Civ.Code § 3262 (West 1974), which generally invalidates construction contract provisions which purport to waive the lien rights of those not party to the agreement. The implication, of course, is that a contractor may, consistent with public policy, agree to waive his own lien rights.

Other jurisdictions have considered whether a construction contract clause waiving subsequent lien rights is valid. The majority rule appears to be that such clauses are effective, *see, e. g., J. B. Cieri Construction Co. v. Gramercy Construction Corp.*, 13 A.D.2d 901, 215 N.Y.S.2d 994 (App.Div.1961); *Bendik v. Uniontown S. R. Co.*, 408 Pa. 66, 182 A.2d 512 (1962); *Hammond Hotel & Improvement Co. v. Williams*, 95 Ind.App. 506, 176 N.E. 154, *rehearing denied*, 95 Ind.App. 506, 178 N.E. 177 (1931); *Mitchell v. Wrightstown Community Apartments, Inc.*, 4 N.J.Super. 321, 67 A.2d 203 (App.Div.1949); *Capitol Plumbing and Heating Supply Co. v. Snyder*, 104 Ill. App.2d 431, 244 N.E.2d 856 (1969), and are therefore presumably consistent with public policy. This is so even though the owner has failed to pay all sums owed under the construction agreement for the waiver of the lien is merely a waiver of a particular remedy and not a release of the underlying obligation. *J. B. Cieri Construction, supra; Formigli Corp. v. Fox*, 348 F.Supp. 629

(E.D.Pa.1972) (Pennsylvania law); *Mitchell, supra; Hammond Hotel, supra; Capitol Plumbing, supra; cf.* Cal.Civ.Code § 3152 (West 1974) (allowing in personam recovery on a debt notwithstanding any provision relating to liens).

The California courts have often enforced similar promises against laborers and suppliers when the promises were required by a surety as a pre-condition to employment or purchase. *See, e. g., Giant Powder Co. Consolidated v. Fidelity & Deposit Co. of Maryland*, 214 Cal. 639, 7 P.2d 1023 (1932); *Fraters Glass & Paint Co. v. Southwest Construction Co.*, 200 Cal. 688, 254 P. 1097 (1927); *W. R. Spalding Lumber Co. v. Fradkin*, 68 Cal.App.2d 308, 156 P.2d 450 (1945); *Kennedy v. National Surety Co.*, 111 Cal. App. 306, 295 P. 359 (1931). We see little reason to distinguish between a waiver required by a surety and one required by the owner, especially in light of *Martin v. Becker*, 169 Cal. 301, 312, 146 P. 665, 670 (1915):

So far as this examination of authorities has proceeded, we find that the actions are between the contractor and the owner of the property upon which the work was done, to enforce the lien upon that property, and we find that the adjudications are merely to the effect that the courts will consider each of these contracts according to its facts, and that when the contract between the parties is such as to force the conclusion that the intent of the parties was to waive the mechanic's lien, * * * it is held that these contracts are inconsistent with the conception of a right to a mechanic's lien. * * * The decision in each case is based upon findings that the nature of the contract under which the security is taken forces the conclusion that there was a waiver of the right to the lien: Of these cases no criticism may be made, and with them no fault may be found.

We therefore hold that Article VII of the construction contract waived Johnson's right to lien under California law. It follows Johnson had no property interest

which could be taken.[18] Plaintiffs have no claim within our jurisdiction founded on the mechanic's lien.

## OTHER ENTITLEMENT THEORIES

■■■■ The plaintiffs allege a variety of other jurisdictional theories. All are without merit. Plaintiffs assert 12 U.S.C. § 1713(*l*), *supra* note 14, authorizes suit in this court. That subsection provides in relevant part that "the Secretary shall also have power * * * to pay * * * all expenses or charges in connection with * * * and to deal with [and] complete * * * any property acquired by him under this section * *." Under the plaintiffs' theory, this provision obligates the United States to repay all costs of a contractor if the United States subsequently acquires the property. Subsection 1713(*l*) does indeed allow the Secretary to complete a project, but nothing in that subsection mandates completion occur or that any other expense be paid. It follows that plaintiffs have no right to compel completion or payment and therefore can have no claim based on this provision. *See Marcus Garvey Square*, 595 F.2d at 1130. Moreover, that portion of § 1713(*l*) is apparently directed to the situation where the Secretary is assigned an incomplete project and then completes it. *Id.*; see 12 U.S.C. § 1713(g) (language after "Provided"). Here Johnson completed the project *prior* to the Secretary's acquisition of the property. In any event, 12 U.S.C. § 1713(*l*) does not provide plaintiffs a claim.[19]

■■■ The plaintiffs further allege jurisdiction founded on a theory of unjust enrichment/equitable lien, while their petitions also suggest theories of fraudulent misrepresentation and inducement. Whatever else may be said of the fraudulent inducement and misrepresentation allegations,

> [t]he decision of the Supreme Court in *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), removes any doubt that claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort. * * * [*Somali Development Bank v. United States*, 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974).]

Tort claims, of course, are expressly beyond our Tucker Act jurisdiction.

■■■ The claim based on unjust enrichment/equitable lien is also beyond our jurisdiction. Those doctrines, however, are based not on agreement but are equitable in nature. Both proceed from a perception that a party *ought* to be bound rather than from a conclusion that a party has *agreed* to be bound. *See Cleveland Chair Co. v. United States*, 214 Ct.Cl. 360, 364, 557 F.2d 244, 246 (1977); *J. C. Pitman & Sons, Inc. v. United States*, 161 Ct.Cl. 701, 704–705, 317 F.2d 366, 368 (1963). Plaintiffs' unjust enrichment/equitable lien theory of recovery is therefore based upon a contract implied in law, over which this court has not been

---

**18.** *Compare* this holding *with J. F. Hodgkins*, 162 Ct.Cl. at 44, 318 F.2d at 935–936. The *J. F. Hodgkins* liens attached, under Maine law, when the materials were furnished. Even though such liens had a short duration under Maine law (and would have been unenforceable at the time the *J. F. Hodgkins* suit was brought), a property interest existed *when the Government took possession of the boats* upon the prime contractor's default. Thus, notwithstanding the fact the liens shortly after the taking would have been otherwise unenforceable under Maine law, the critical inquiry is whether the liens were enforceable at the time of taking. *See Armstrong*, 364 U.S. at 41–42, 44, 46, 80 S.Ct. at 1564–1565, 1566, 1567. Here, of course, no such enforceable liens were present when the Government came into possession of the property.

**19.** Plaintiffs raise two other statutory entitlement arguments, based on 12 U.S.C. § 1715r and 9 U.S.C. § 2. Neither has merit. The former section requires a builder to provide a cost certification. Plaintiffs read the section to implicitly mandate compensation when the Secretary unreasonably rejects a cost certification. The statute does not so provide and thus will not support jurisdiction here. *E. g., Testan*, 424 U.S. at 400, 96 S.Ct. at 954. Plaintiffs' argument as to 9 U.S.C. § 2 has even less merit for that provision merely validates arbitration agreements. It in no sense makes the United States liable for the arbitration award against Hoover as the United States was never a party to that agreement. See notes 7–10 and accompanying text, *supra*.

given jurisdiction. *E. g., Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255–1256 (1970).

▇▇▇ Plaintiffs' citation of *Trans-Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370, and related cases [20] does not alter our conclusion that we lack jurisdiction of a claim for unjust enrichment/equitable lien. In those cases, suit was brought against the Secretary of HUD using the limited waiver of sovereign immunity provided by 12 U.S.C. § 1702. *Jurisdiction* of the resulting suits was found under various statutes applicable only to district court litigation, as for example 28 U.S.C. §§ 1331 and 1332 or 12 U.S.C. § 1702 itself. As the *Trans-Bay Engineers* opinion demonstrates, *supra* at 378–382, once jurisdiction is proper, the federal district and circuit courts may apply a variety of substantive theories, including those based solely on equitable considerations. Our inquiry here is different for we seek to determine whether these claims are within our narrow jurisdictional statute. As a claim founded solely on equitable considerations is beyond that statute, we are unable to entertain such a suit. Thus, regardless of the *substantive* application of equitable concerns in *Trans-Bay Engineers* and related cases to allow recovery, we must nevertheless conclude that there is no

jurisdiction in this court over petitions stating such claims. See also note 16 *supra*. We have fully considered all of plaintiffs' other arguments, and these petitions must be dismissed.

Johnson and Aetna's position is not without substantial equity. They have, at their own expense, completed a housing project which is now owned by the United States. The United States obtained that project by accepting assignment of and eventually foreclosing a mortgage which, in part at the United States' behest, was never fully disbursed. Under the Tucker Act, as presently drawn, these plaintiffs have no suit cognizable in this court. Litigation with HUD concerning the mortgage insurance provisions arises not infrequently and if held to be in reality against the United States, *compare Marcus Garvey Square, supra, with Trans-Bay Engineers, supra,* must be brought here.[21] We invite Congress' attention to litigants in the position of these plaintiffs. Until the Tucker Act is changed, however, we have no jurisdiction over the claims presented in these petitions.

## CONCLUSION

For the reasons discussed above, we conclude that we lack jurisdiction over the claims stated in these petitions. Accordingly, defendant's cross motions for summary

---

**20.** *E. g., F. W. Eversley & Co. v. East N. Y. Non-Profit HDFC, Inc.,* 409 F.Supp. 791 (S.D.N.Y.1976); *Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc.,* 407 F.Supp. 164 (1975); *Travelers Indem. Co., supra* note 16.

**21.** A separate opinion asserts that this record is somehow unclear as to whether the Federal Housing Commissioner required Pacific to actually transfer the undisbursed proceeds to HUD. See 24 C.F.R. § 207.258(b)(4). If that was done, the separate opinion theorizes, the district court may have incorrectly concluded these facts were controlled by Judge Tang's majority opinion in *Marcus Garvey Square.* Thus, the separate opinion herein concludes, we should retransfer this case to the district court to "reconsider" its understanding and application of the law of the circuit. The record before us discloses, however, that although the original loan amount was $1,746,800, Pacific only claimed benefits for the funds actually disbursed (and not repaid), $1,588,587.53. Had Pacific actually transferred both the undis-

bursed *and* the disbursed portions of the loan, the statute would have entitled Pacific to claim the full amount of the original loan commitment. 12 U.S.C. § 1713(g) (second sentence). Thus, under the discretion given the Commissioner by 24 C.F.R. § 207.258(b)(4), an assignment of only the *disbursed* portion of the loan occurred. The undisbursed proceeds were retained by the mortgagee and never paid to HUD. Those, as the separate opinion indicates, were precisely the facts of *Marcus Garvey Square.* See 595 F.2d at 1131 & n.3, 1132 n.3.

Whether the undisbursed funds were ever delivered to HUD is, of course, a separate question from whether HUD can be compelled, solely by virtue of its alleged status as successor mortgagee, to pay a like amount in damages to these plaintiffs. The latter proposition is discussed *supra* at notes 11–16 and accompanying text.

judgment against Johnson in 455–79C and Aetna in 454–79C are hereby granted. Johnson's and Aetna's respective summary judgment motions are hereby denied. The petitions are hereby dismissed.

DAVIS, Judge, concurring in the result in part and dissenting in part:

Though I do not join the court's opinion, I agree with its conclusion that plaintiffs have not shown themselves entitled to monetary relief from the general funds of the Treasury which are necessarily involved in any suit here under the Tucker Act—and I accept much of the opinion's reasoning to that effect.[1]

But (as the majority says) "Johnson and Aetna's position is not without substantial equity," and the Department of Housing and Urban Development (HUD) may be liable to them out of the contract retainages, unpaid progress payments, and other separate funds still in the possession and control of that agency. This suit was originally brought in the District Court against HUD (and private entities). Under the statute, the Secretary of HUD is expressly "authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal." 12 U.S.C. § 1702 (1976) (part of the National Housing Act). This is a broad consent-to-suit, *F. H. A. v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940); *United Electric Corp. v. United States*, 647 F.2d 1082 at 1083, 1084 (1981), which reaches at least the funds in the possession and control of HUD. *F. H. A. v. Burr, supra*, 309 U.S. at 250, 60 S.Ct. at 492; *Marcus Garvey Square, Inc. v. Winston Burnett Const. Co.*, 595 F.2d 1126, 1131 (9th Cir. 1979); *Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 382–83 (D.C.Cir.1976). As the majority recognizes, in a suit against HUD under this general

waiver of immunity the tribunal is authorized to apply principles of non-consensual equitable restitution, of tort law, and of contracts implied-in-law—all of which are excluded from this court's jurisdiction under the Tucker Act. *See United Electric Corp. v. United States, supra*, at 1084–1085; *Trans-Bay Engineers, supra*, 351 F.2d at 380–83. If plaintiffs prove their case, they might well be able to recover from HUD at least the unpaid progress payments and retainages, and perhaps more. *See Trans-Bay Engineers, supra*.

The District Court in California apparently thought that it had no jurisdiction against HUD under the Ninth Circuit's decision in *Marcus Garvey Square, supra*. But that case may well be significantly different on the very point of whether HUD had separate funds of its own from which recovery could be allowed. There, the Secretary of HUD did *not* take assignment of the undisbursed amounts but specifically directed that the principal of the mortgage be reduced by the undisbursed funds. *See Marcus Garvey Square, supra*, 595 F.2d at 1131. That fact—that in those circumstances the undisbursed funds no longer constituted separate HUD funds— was the direct foundation for the Ninth Circuit's holding that that suit could not be maintained against HUD. *Ibid*. Here, on the other hand, the undisbursed funds (so far as we really know) may well have been assigned to HUD along with the rest of the Building Loan Agreement, the mortgage, all the other credit instruments and the related documents. The record is not at all clear. In my view, therefore, *Marcus Garvey Square* does not necessarily exclude the District Court from jurisdiction over this case, and the District Court is in a better position to determine the true facts.[2] In

---

1. The court correctly holds that Article VII of the construction contract bars the contractor's claim of a mechanic's lien for which just compensation might have to be paid. Johnson's petition makes various claims that he was improperly induced (by others than the Government) to agree to this provision, but I think it clear from his own allegations that he knew that he was agreeing to this clause (and its

meaning) even though he may have thought that he would not in the end be monetarily injured by its inclusion.

2. In *Marcus Garvey Square* the Ninth Circuit said: "If it should appear that the Secretary's reduction of the principal obligation, either by a general rule of policy or by action in a particular case, was done solely for the purpose of

*Trans-Bay Engineers, supra,* the District of Columbia Circuit (per Leventhal J.) assumed jurisdiction and conditionally granted relief against HUD in a case not far from this one.

Accordingly, I would retransfer this case under 28 U.S.C. § 1506 (1976) back to the District Court in the hope that that court will reconsider its jurisdiction against HUD under 12 U.S.C. § 1702. *See Peoples Apparel, Ltd. v. United States and City of Council Bluffs, Iowa,* 650 F.2d 291 (1980), *Nathan Smith v. United States,* 654 F.2d 50, decided this day.

depriving the District Court of jurisdiction, then that action would be ignored for the purpose of determining jurisdiction." 595 F.2d at 1132, n.3. In the present case we have no

knowledge at all why Pacific claimed benefits for less than the original loan amount, and very little information on what funds were actually assigned to HUD.