John B. DEAKINS

v.

The UNITED STATES.

No. 256–81C.

United States Claims Court.

May 20, 1983.

■■■■■■■■■■■■■

Jerry S. Jones, Johnson City, Tenn., for plaintiff.

Robert G. Giertz, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge.

This case is before the court on cross-motions for summary judgment pursuant to RUSCC 56, formerly Rule 101 of the Rules of the United States Court of Claims. Plaintiff alleges, in connection with a construction project under a rural housing loan program, that the government changed the previously agreed to plans and specifications in the course of the construction of low-cost housing, resulting in damage to the plaintiff in the approximated amount of $100,000.[1] The government maintains that the claims raised by the plaintiff are beyond the jurisdiction of this court, that there was no warranty of plaintiff's construction design and therefore that he has failed to state a claim on which relief can be granted, and that the government has met any obligation it had to the plaintiff.

Upon review of the motions presented and the supporting documentation, and following oral argument by the parties, it is concluded that no genuine issue of material facts exists in this case and that plaintiff's claims are within the jurisdiction of this court, but that there is no liability on the part of the government for the damages allegedly suffered by the plaintiff in this case. Therefore, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted.

The facts as presented by the parties are as follows.

### Facts

Plaintiff is a developer and contractor who owned a parcel of land in Greene County, Tennessee. Plaintiff planned to develop his property into a subdivision of low-cost housing to be known as Crockett Timbers. While the exact plans for the subdivision are not clear, it appears that at least twenty single-family dwellings were eventually to be constructed by plaintiff. However, it is the first ten of these, all of which were substantially completed at the time of the controversy, which are of primary concern here.

Plaintiff undertook construction in conjunction with a federal rural housing (RH) loan program under § 502 of Title V of the Housing Act of 1949, as amended, 42 U.S.C. § 1472. The program contemplated the issuance of Rural Housing Conditional Commitments by the Farmers Home Administration (FmHA) to qualified developers and sellers to encourage the availability of rural housing and, also, to provide a source of mortgage money to qualified buyers.[2] According to the regulations in effect at the time, the objective to be achieved in issuing conditional commitments was—

> to encourage construction and rehabilitation of dwellings in rural areas by providing builders and sellers with conditional assurance that dwellings to be built or rehabilitated will meet FmHA lending requirements and that, subject to the availability of funds, FmHA will make loans to qualified loan applicants to buy the homes.

7 C.F.R. § 1822.302.

In order to obtain such a commitment, the builders or sellers, in addition to meeting certain eligibility requirements, also had to make written requests to the FmHA for each dwelling for which financing was

---

1. Although the petition states that plaintiff has suffered losses of approximately $100,000, plaintiff's motion for summary judgment indicates that he has suffered financial losses of $54,777.74, and plaintiff's affidavit attached to his motion outlines losses of $66,053.74.

2. 7 C.F.R. § 1480. All references to the Code of Federal Regulations are to the regulations in effect on January 1, 1978.

sought. Included in the application was a "Property Information and Appraisal Report," plus an application fee for each unit. The FmHA County Supervisor had the responsibility for evaluating the applications for conditional commitments and approving them if all requirements were met. Approval was signified by the County Supervisor's signing and issuing the conditional commitment Form FmHA 444–11.

Preliminary approval for the Crockett Timbers subdivision was given by the county planning commission of Greene County in 1975. Thereafter, the subdivision plans were forwarded to the FmHA state office to receive its approval for FmHA loan funds. Preliminary approval was granted, but it was subject to the receipt of certain additional information concerning the subdivision plans, including soil absorption data. Although plaintiff submitted additional information to the state FmHA office, final approval was withheld in order to permit the FmHA county supervisor to review the drainage plan for the subdivision. In addition, the builder was told that each of the homes were to have a septic tank system that conformed to local health department requirements.

Supplemental proposals of the plaintiff were submitted by the County Supervisor to the state office which, as a result, authorized the processing of the loans. Eventually, conditional commitments were issued for lots 1 through 10 of section 1. Attached to each commitment was a permit, which was approved by the local health authority, for the construction of a specially designed subsurface sewage system.

Thereafter, the first six houses in the subdivision[3] were built, inspected and sold with FmHA loans. Soon, however, the owners of one of these properties began to experience problems with their septic system, as well as problems with standing water, which they attributed to drainage from adjacent lots. An inspection by the

county health department revealed conditions which included seepage and ponding of effluent from the septic tanks of each of the six houses, standing water, and unpleasant odors. In fact, the seepage from the septic tanks was so extensive that it was found to be flowing from one property onto the property of adjoining landowners. Advice was sought from the FmHA state office as to whether further loans should be approved in the Crockett Timbers Subdivision. Upon evaluating the situation, the state FmHA office, in a letter dated April 16, 1979, conditioned the approval of loans for the remaining four units upon the builder's compliance with the following conditions: (1) The installation of or redesigning of the drainage system to allow surface water to properly drain from the first six home sites; (2) the reworking of the existing septic systems for the first six homes by either installing a dual system or an alternate method recommended by the Tennessee Department of Public Health; (3) the draining of water collected under the six houses by use of drain pipes installed through the foundation wall; and (4) the modifications of the four new properties in the same manner as the existing six systems.

The letter concluded with a statement that "[a]fter these are closed out you are to discontinue any further housing activity in this subdivision."

The conditions imposed by the state FmHA office were met by plaintiff after a revised design was approved by the State Environmental Sanitation Department and new permits were issued. The new design called for an expansion of the capacity of the septic systems, and additional landscaping. The loans on the remaining four lots were approved and the houses eventually sold. The additional expense and delays caused by the revised design are the source of plaintiff's claim for damages from the government.

---

**3.** For the purpose of this discussion and to simplify matters, the first six lots to be completed will be referred to as lots 1–6, and the remaining four as lots 7–10, corresponding to their order of completion. These numbers do not necessarily correspond to the lot numbers on plaintiff's plans and the conditional commitments.

*Discussion*

■ Defendant maintains at the outset that this court lacks jurisdiction to hear this case pursuant to the Tucker Act, 28 U.S.C. § 1491. The Tucker Act provides the general Congressional consent for suits in this court "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Aetna Casualty and Surety Co. v. United States,* 228 Ct.Cl. 146, 151, 655 F.2d 1047, 1051 (1981). Defendant argues that no express or implied contract exists in this case, that the acts performed by the government were performed in its sovereign capacity, and that the government has not waived its sovereign immunity and consented to suit.

Defendant likens this case to *D.R. Smalley & Sons v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). In *Smalley,* plaintiff contended that it had an express or, alternatively, an implied contract with the government by virtue of the fact that: (1) The construction contracts at issue in that case were drafted under defendant's standards and regulations; (2) they were approved and executed with defendant's express approval; (3) the work in progress and changes were approved by defendant; and (4) there was a subsidization guaranteed to the state. *Id.* at 596–97, 372 F.2d at 507. The court in *Smalley* concluded that the government's obligations under the Federal-Aid Highway Acts were an exercise of its sovereign powers, not directed solely to plaintiff but affecting, rather, the general public and done for the common good and general welfare. *Id.* at 597, 372 F.2d at 507. As such, the government's acts did not make it liable for damages incurred as a consequence of these acts. The court determined that the grants which provided assistance to the state were gratuitous in essence and did not create liability simply because the government set quality standards for work done and conditioned reimbursement on government approval. The court also dismissed plaintiff's agency argu-

ment on the theory that "[t]he defendant did not sign the contracts with the plaintiff and there were no negotiations or communications whatsoever between them. Consequently, there were no express contracts between them." *Id.* at 598, 372 F.2d at 508.

The *Smalley* doctrine, which denied relief for damages resulting from governmental acts performed in a sovereign capacity, was raised by the defendant in *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 468 F.2d 922 (1972). In that case, plaintiff performed construction work in connection with a housing project in Monroe, Michigan. Plaintiff's contract was with the Monroe Housing Commission, a local housing authority established to enable the community to become eligible for federal aid for local housing projects under the Housing Act of 1937, 42 U.S.C. § 1401, *et seq. Id.* at 708, 468 F.2d at 923. The United States was named as a party to the suit, even though it denied that there was privity of contract with the plaintiff and asserted its sovereign immunity.

The court agreed that the government was immune from suit. In dismissing the case, the court characterized the circumstances presented in *Housing Corp. of America* and *Smalley* as follows:

The contract here in issue is one of many pursuant to which the Federal Government subsidizes projects of state and local authorities for the public betterment. The United States, however, does not make itself a party to the contracts relating to said projects but obligates itself by separate agreements, as here, to local authorities for the funding of those projects it approves. The significance of that approval is spelled out here in Article IX. This does not create an express or implied contract between plaintiff and defendant nor does it make the Commission defendant's agent through HUD. HUD's actions were performed in defendant's capacity as sovereign. This principle has been settled for some time by a similar case involving construction under the Federal-Aid Highways Act. *D.R.*

*Smalley & Sons v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). The *Smalley* case is squarely in point. *Id.* at 710, 468 F.2d at 924.

The court has more recently held that "where the United States does not make itself a party to the contracts which implement important national policies, no express or implied contracts result between the United States and those who will ultimately perform the work." *Aetna Casualty and Surety Co. v. United States,* 228 Ct.Cl. at 152, 655 F.2d at 1052. In this last instance, the court found there was no jurisdiction and dismissed the petition.

Defendant's argument that there is no jurisdiction under the Tucker Act in the case at bar is grounded on the presumption that there is no contract between plaintiff and the government. I disagree. While it is true, as in the cases cited, that the plaintiff has no construction contract with the United States for building the Crockett Timbers subdivision, this is hardly conclusive that there is no contractual relationship between them whatsoever. There was in fact a contractual relationship embodied in the conditional commitment. The conditional commitment was an agreement between the plaintiff and the government, reflecting a considerable amount of negotiation and communication, which was signed by FmHA officials acting within the scope of their authority. Under the agreement, plaintiff was induced to build homes by the promise that if the homes were built in accordance with FmHA requirements, low interest loans would be made available by the government to eligible purchasers to buy the homes. The difference between these facts and those in the cases relied on by defendant is plain. Unlike the cited cases, where the only contract that existed was one between the plaintiff and a party other than the United States Government, in this instance no other party, such as a local housing authority or state or local government unit, whose signature appeared

on the contract, was involved in the Crockett Timbers development.

A "commitment" is defined as an—

[a]greement or pledge to do something; *e.g.,* a statement by a lender that a loan will be made under certain terms. Commitments may be of various types, that is, a conditional commitment, subject to certain items being met, or a firm commitment, which is binding on the lender without conditions.

*Black's Law Dictionary,* 248 (5th ed. 1979). The regulations pertaining to RH loans describe a conditional commitment as—

assurance from FmHA to the commitment applicant that the dwellings to be built or rehabilitated and offered for sale will be suitable for purchase at a price not above a specified maximum amount by loan applicants who are qualified for RH loans if built in accordance with FmHA approved plans and specifications. The conditional commitment does not reserve funds for a loan nor does it assure that a loan applicant will be available to buy the dwellings.

7 C.F.R. § 1822.303(a). Both of these descriptions make clear that the commitment binds the issuing party if and when the conditions agreed upon are met. In fact, it is likely that the contractual nature of this arrangement, between the United States Government and the builder or seller, is what makes the RH loan program viable. It is unrealistic to expect that plaintiff or any other developer would readily engage in the construction of low-cost rural housing, as the government desired, if he were not assured that mortgage money would be available to assist in the sale of the home upon completion. It is not likely, as defendant argues, that "[p]laintiff merely constructed the homes in the hope of selling them on the open market." Rather he undertook the project with the understanding that if he built the low-cost rural housing, the government would under certain conditions guarantee that loans would be made available for the purchase of these specific dwellings. In fact, the conditional commitment, which was signed by Vernon E. Kirk,

with a typed notation which identified him as the "Authorized Representative of FmHA," clearly states the understanding between plaintiff and defendant to be as follows:

> The Farmers Home Administration will, if the construction is completed in accordance with the terms of the conditional commitment, approve the house as suitable for a rural housing loan and will, if and when funds are available, provide a loan to an eligible, qualified applicant to buy the house. The agency will not, however, assure that a qualified buyer for the home will be available or reserve funds for the loan unless the conditional commitment and the loan are approved at the same time and funds have been obligated by the Finance Office. The commitment applicant's selling price if the dwelling is bought and financed with a Rural Housing loan will not exceed the commitment price.

It is, accordingly, concluded that the conditional commitment represented a contractual, albeit conditional, obligation of the government which brings this case within the jurisdiction of this court.

Having found that there is jurisdiction in the Claims Court to decide this case, it is necessary next to consider defendant's argument that plaintiff has not stated a claim on which relief can be granted.

Plaintiff, Mr. Deakins, alleges that he built ten homes in the Crockett Timbers subdivision to meet FmHA specifications. According to plaintiff, after the first six were sold and occupied, with mortgage financing from the FmHA, and after the septic systems of the other four homes were installed, but before they were 100% finished, a sewage problem developed with one of the sold units. Plaintiff complains that the FmHA required corrective action on the sewage systems of all ten houses before it would approve loans on the four unsold

houses. Mr. Deakins also maintains that the sewage disposal system that he utilized in each of the homes was designed to meet local health department requirements, and that the local health department had approved the sewage system of each of the ten homes in the subdivision prior to the development of any problems. County health department approval was a "specific condition" listed in the conditional commitment with respect to sewage disposal for the grant of loans on the property, and, according to Mr. Deakins, was all that the FmHA represented was necessary to fulfill that condition.[4] As a result of the revised designs required to be implemented to provide a working sewer system, Mr. Deakins maintains he suffered considerable financial loss.

Defendant's response to plaintiff's allegations is that there was no change in plans and specifications because defendant never warranted a design for the construction of the septic system in the first place. Defendant grounds its argument on the fact that in addition to the health authority approval, the conditional commitment also required that the sewage treatment system meet the standards set out in the "Minimum Property Standards" (MPS) established by HUD and adopted by the FmHA.[5] Section 615–9.1 of the MPS called for a "water-carried sewerage system adequate to dispose of all domestic wastes in a manner which will not create a nuisance, contaminate any existing or prospective water source or water supply, or in any way endanger the public health." Moreover, each individual sewage-disposal system was to include an "acceptable absorption system." *Id.* at § 615–9.2d. Beyond this, defendant argues that there were no plans, drawings or specifications which restricted the builder to a particular design, and that the MPS constituted, at most, performance as opposed to design specifications. The distinc-

---

4. The conditional commitment required: "Approval in writing of water supply and/or sewage disposal installation by health authority."

5. The conditional commitment, in addition to requiring a sewage disposal system which was

approved by the health authority, also required, under the caption "Other Conditions," that "[a]ll work and materials meet MPS and Tenn. 424.1A."

tion between these varying types of specifications was described by this court in *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 689, 412 F.2d 1360, 1362 (1969). With design specifications—

> defendant set[s] forth in precise detail the materials to be employed and the manner in which the work was to be performed, and plaintiff was not privileged to deviate therefrom, but was required to follow them as one would a road map. In contrast, typical "performance" type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.

■ Contracts which contain design specifications carry with them an implied warranty of suitability. *Id.* at 690–91, 412 F.2d at 1363; *United States v. Spearin,* 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918).

■ Defendant maintains that when the sewage disposal system called for by the conditional commitment is viewed in its totality, it is more closely analogous to a performance specification than a design specification, since the government has left the details to be used to conform his work to the standards contained therein to plaintiff.

The court agrees with the defendant that what was presented to plaintiff as the conditions upon which the loan commitment would be issued was no more than a performance standard, carrying with it no warranty of suitability. The "Special Condition" that the sewer system had to be approved by the local health authority cannot be interpreted as a substitution of that approved design for the MPS, or an adoption of that design which would make it a design specification carrying an implied warranty. While the "Special Conditions" may be included to allow for more stringent regulations required at the local level, I do not feel they were meant to undercut the standard set out in the MPS. The standards prescribed by the Secretary of HUD are precisely what they purport to be, that is, "Minimum Property Standards," and thus any interpretation of the regulations governing the issuance of government loans ought not open the door to a dilution of those standards.

This conclusion is supported by several sources which are relevant to this dispute. In the section of the FmHA regulations dealing generally with "Planning and Performing Development Work," in connection with loans to individuals, the regulations state that "all design, materials and construction will *meet or exceed* the requirements of the appropriate mandatory MPS," where new housing is concerned. 7 C.F.R. § 1804.3 (emphasis added). Section 1804.71, which addresses modifications of requirements and recommendations, states that the standards set out in §§ 1804.65–70, concerning site development work, are minimum standards and that higher standards may be required if the health and safety of the public is in danger. It also prohibits the state director from granting variances which *might reduce the intent of the subpart.* 7 C.F.R. § 1804.71(b). Further, § 1822.312, dealing specifically with RH loans, lists failure to comply with the MPS as an event which may trigger cancellation of outstanding conditional commitments.

In addition to the regulations, the conditional commitments themselves list compliance with the MPS as one of the "General Conditions" printed on the Form FmHA 444–11, and as one of the "Other Conditions" specifically typed in at the end of the form. Indeed, the general conditions also clearly provide for cancellation of the conditional commitments by the FmHA if the construction "is not in accordance with approved plans, specifications, or MPS."

Further, the MPS states that compliance with the criteria contained therein is mandatory (MPS § 200); that sanitary facilities and a safe method of sewage disposal is required for each living unit (MPS § 101–3.1); and that site conditions must be such that there is freedom from hazards which might adversely affect the health and safety of occupants or which might impair the

customary use and enjoyment of property (MPS § 102–1).

Section 615–9.1(e) provides that "[a]ny system of individual sewage disposal which is acceptable herein but which is not permitted by the local health authority having jurisdiction shall not be used. Evidence of approval by such authority for each completed system will be required in all cases." This provision clearly anticipates that there will be occasions when local standards will be stricter than the MPS and defers to those standards. The section also strongly suggests that local codes can only enhance and not reduce MPS requirements. *See also Davis v. Romney,* 490 F.2d 1360, 1367–68 (3d Cir.1974).

Finally, common sense would lead one to conclude that the local health department could not properly satisfy the FmHA conditions by authorizing an unsatisfactory septic system design. In this case, the FmHA specifically required a specially designed system because the conditions on plaintiff's tract warranted one. Certainly, it would make no sense to conclude that the FmHA would go to the trouble of calling for a specially designed system as an additional condition to plaintiff's commitment if the system were not, at the very least, effective to meet the minimum MPS standards.

In his affidavit accompanying plaintiff's response to defendant's cross-motion for summary judgment, Mr. Deakins denied that he knew of correspondence between the state FmHA office and the FmHA county supervisor discussing the unacceptability of plaintiff's soil absorption tests and calling for a specially designed septic system. Plaintiff acknowledges that he was told only that the septic system had to be approved by the local county health department. Plaintiff further states that he relied on the "Specific Condition" designated as a requirement of the conditional commitment which stated that approval in writing had to be obtained for the water supply and/or sewage disposal installation. Plaintiff complains that defendant "did not offer nor make available * * * a copy of the MPS."

The court is not sympathetic to plaintiff's arguments that he was not given a copy of the MPS and that he was unaware of the conclusions reached by both state and county officers of the FmHA about the need for a special septic system design. It is inconceivable that plaintiff could have failed to appreciate the importance of a workable sewage system as he explored the possibility of developing his property under the RH loan program. Nor can he disclaim knowledge that the state FmHA office was concerned about the suitability of the land being developed for individual sewage disposal systems. Plaintiff received a letter from the county supervisor on January 9, 1976, explaining the state office's concern about soil absorption and drainage on the property and telling plaintiff that the situation needed to be reviewed before final approval for the conditional commitment was granted. This alone should have alerted him to the possibility that special attention might be needed for this segment of the construction. Whatever plaintiff thought at this time, he certainly must have been aware of his ultimate responsibility to provide each housing unit with a functioning sewage disposal system. Certainly, the FmHA's conditioning of its loan commitment to plaintiff on a workable system leaves little doubt as to the importance which is placed on this requirement.

Having decided that the government did not warrant the design for the septic system approved by the county health department, but rather conditioned its loan approval on the "performance standards" expressed in the MPS and the regulations, it is next necessary to determine if plaintiff's performance of its obligations under the conditional commitments was sufficient to impose a duty to perform on the part of the government.

Plaintiff argues that inasmuch as six of the homes had already been sold and the septic systems of the remaining four homes installed, all conditions called for by the conditional commitment with respect to sewage disposal had been fulfilled. Plaintiff therefore maintains that defendant

should not have required him to effect repairs on the four unsold houses or the six which had been sold in order to obtain loans on the last four.

■ For reasons previously stated, it is clear that with respect to the last four homes, the conditional commitment did not obligate the government to extend loans for these units until a satisfactory sewage disposal system was installed. Somewhat more troublesome is whether the government could condition loans for the four unsold houses on repairs to the first six. Under the defendant's conditional commitment to plaintiff, it might be argued that there were ten individual contracts, each containing a discrete set of obligations unrelated to the others. Theoretically, this would prevent the conditioning of loans on the last four homes to repairs to the first six. However, the fact that these ten homes were part of a planned subdivision brings them under the FmHA's regulations pertaining to site development and permits the individual units to be viewed in relation to the others. For this reason, as well as the general provisions of the individual commitments and the MPS, the government may condition the approval of loans for lots 7–10 on additional repairs to lots 1–6, even though these properties were individually approved for loans and sold on the basis of separately authorized septic tank designs.

Support for this conclusion is found in § 1822.309 of the regulations which discusses the processing of applications. Section 1822.309(a)(4) states that the county supervisor will issue conditional commitments only if—

[t]he dwelling and site comply with the local codes and ordinances and the requirements of the local health department are met. When the property is located in a subdivision, the subdivision must meet the requirements of Subpart D of Part 1804 of this chapter.

7 C.F.R. § 1822.309(a)(4).

Subpart D of Part 1804 discusses planning and performing site development work. The section governing water and waste disposal systems states that where individual systems are utilized, data assuring performance of the individual systems is required to be filed with the county office. With regard to the sewerage systems, there must be provided "assurance of non-pollution of ground water supply. State health authorities or their locally approved agents shall be consulted to insure that installation of septic tank systems will not pollute ground water sources or create other health hazards." 7 C.F.R. § 1804.-66(a)(5)(iii)(B). The affidavits of Mr. William Smith, of the Greeneville-Greene County Health Department, and Mr. Ralph A. Elam, the FmHA Assistant District Director of District 9, Winchester, Tennessee, stated that the prevailing conditions posed a threat to the health and safety of the entire ten-home subdivision. The seepage of effluent in the back yards of each of the completed homes was threat enough, but when the sewage was capable of being carried from yard to yard by the pooling water, the condition became intolerable. Any aerially transmitted health hazards would pose a danger to all the residents regardless of whether individual lots were physically affected by the seepage. In addition, the stench of sewage would unquestionably prevent the owners of the six sold homes and the purchasers of the remaining four homes from the full use and enjoyment of their homes. In the words of Mr. and Mrs. Billy Joe Crum, the owners of one of the six sold homes, "For the past few days we haven't been able to use our toilet. * * [T]he odor has crept into the house and is sickening. It is a shame that we have to leave our own home to go where the air is fresher and healthier."

Thus, one or more of the completed units could adversely affect the remaining four, and a clear health hazard existed. The situation was one that appeared to be particularly covered by the MPS, and it was well within the purpose of the regulations for the FmHA to refuse to allow any more homes to be sold in the Crockett Timbers subdivision until all the sewage systems were in proper working order. So long as those defects remained, plaintiff could not

meet the conditions of the commitment, and the defendant thus had no obligation to make loans available for the last four units.

The regulations point out that the MPS is meant to supplement the regulations with "technical requirements for minimum acceptable design, materials and construction methods to protect the interests of the borrower and the FmHA." 7 C.F.R. § 1804.-2(d). Similarly, FmHA construction supervision and inspection is intended for the protection of the borrowers and the FmHA. *Park v. United States,* 517 F.Supp. 970, 974 (D.Or.1981). It is unfortunate that the design approved by the local health authority and executed by the builder for sewage disposal turned out to be unsatisfactory to the FmHA. However, it is clear that the government could not be expected to perform its part of the contract based on a final product which was so obviously unacceptable. I therefore find that in keeping with the terms of the commitments, the FmHA was under no obligation to make loans available to buyers until plaintiff corrected the problems with the septic systems on lots 7–10. Further, the FmHA was within the terms of the commitment when it made the loans on the last four properties additionally contingent on the correction of the problem with the first six sewage systems.

■ Finally, plaintiff alleges he is damaged with respect to ten water taps on ten additional lots which he is now prevented from developing under the RH loan program due to the FmHA's prohibition on further building in the subdivision. I find no merit to this complaint since there was no contractual arrangement whatsoever with the FmHA for additional units, and defendant is thus under no obligation for any loss resulting from this groundwork.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment is dismissed, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

IT IS SO ORDERED.