**WELLS FARGO BANK, N.A., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 51–88C.

United States Claims Court.

July 21, 1992.

Daniel Joseph, Washington, D.C., for plaintiff. David C. Tobin and Amy L. Cohen, Washington, D.C., of counsel.

Terrence S. Hartman, Commercial Litigation Branch, with whom were David M. Cohen, Director, and Stuart M. Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for defendant. Robert E. Lusk, Dept. of Agriculture, of counsel.

## OPINION

SMITH, Chief Judge.

This case is before the court on cross-motions for summary judgment. Wells Fargo Bank, N.A., alleges that the Farmers Home Administration (FmHA) refused to issue a loan guarantee, and that this act constitutes a breach of contract. Wells Fargo sought this loan from the FmHA, under the authority of a 1980 amendment to the Consolidated Farm and Rural Development Act which sought to encourage the development and construction of non-fossil fuel sources. In the alternative, plaintiff contends that actions of the FmHA led plaintiff to believe that the guarantee would be issued and that the FmHA is thus estopped from denying the guarantee. Plaintiff also alleges that the FmHA was unjustly enriched in relation to the servicing of the debt on a fluorocarbon plant, and that plaintiff is entitled to damages in *quantum meruit.* Damages sought are in excess of $25 million.

Upon reviewing the motions and hearing oral argument, the court concludes that the plaintiff's major claims are within the jurisdiction of the Claims Court, that a contract existed between the parties, and that the government is liable for any damages flowing from its breach of that contract. Therefore, for the reasons set forth below, defendant's motion for summary judgment with respect to the contract claims is denied, and plaintiff's cross-motion for partial summary judgment is granted. With respect to plaintiff's *quantum meruit* claim, this court does not possess jurisdiction, and the defendant's motion for summary judgment is granted as to this issue.

## FACTS

In June 1982, American Gasohol Refiners, Inc. (AGRI) applied to the United States Department of Agriculture, Farmers Home Administration (FmHA) for a guarantee on a $20 million loan for the construction of a fuel ethanol plant. Under the loan guarantee program, the FmHA guaranteed payment of loans for ethanol plants, provided that the borrower and the lender bank fulfilled the terms of a Conditional Commitment for Guarantee [1] (Condi-

1. The Conditional Commitment lists the require- ments that must be met before a guarantee is

tional Commitment) issued by the FmHA. The guarantee would require the FmHA to share in any losses suffered by the lender if the project failed.

In October 1982, the FmHA issued a Conditional Commitment listing AGRI as the borrower who would build and operate the ethanol plant and Mid–Kansas Federal Savings and Loan of Wichita (Mid–Kansas) as the lender. The Conditional Commitment indicated that the FmHA would guarantee 90% of the loan if certain conditions were met. The Conditional Commitment was signed by the FmHA, AGRI, and Mid–Kansas. The Conditional Commitment provided that, "[I]n accordance with applicable provisions of the FmHA regulations ..., [the FmHA] will execute ... [the] 'Loan Note Guarantee' subject to the conditions and requirements specified in said regulations...." Thus, in order for the Loan Note Guarantee to be issued, twenty-nine conditions and requirements needed to be met. In addition, the lender was required to certify before the guarantee would be issued that there had been no adverse change in the condition of the borrower. The Conditional Commitment provided that:

A Loan Note Guarantee will not be issued until the Lender certifies that it has *no knowledge of any adverse change,* financial or otherwise, in the Borrower, his business, or any parent, subsidiaries, or affiliates since it requested a Loan Note Guarantee.

This "adverse change" language is central to this dispute. The Conditional Commitment was to expire in December of 1983, but was extended several times though the end of 1986.

In December 1982, Wells Fargo Bank, N.A. (Wells Fargo) made a $20 million interim loan commitment to AGRI for con-

struction of the ethanol plant, and agreed to participate in the guarantee with Mid–Kansas. AGRI began construction after the Conditional Commitment was issued and the construction loan obtained, and the plant commenced operations in early 1984. Throughout 1984, however, the plant ran at less than full capacity for a number of reasons. Wells Fargo and High Plains [2] determined that an additional $3.5 million was necessary to bring the plant to full production. After months of negotiation, in September 1985, Wells Fargo, High Plains, and the FmHA entered an agreement (the Intercreditor Agreement) which addressed the terms and conditions under which additional financing would be advanced by Wells Fargo. Wells Fargo sought to ensure that if they advanced additional funds and the plant reached adequate production levels, the guarantee would be issued. The Intercreditor Agreement indicated that the Loan Note Guarantee had not yet been issued "[d]ue primarily to difficulties in achieving adequate production levels at the Plant." The agreement stated that additional financing was being considered "[i]n order to provide additional funds to [High Plains] so as to modify and operate the Plant to achieve adequate production levels, and cause the FmHA Guarantee to be issued...." The Intercreditor Agreement required, among other things, that a defaulted fluorocarbon plant loan [3] receive payment priority, and that all past due interest and principal on the fluorocarbon plant loan be paid before the loan guarantee would be issued. The Intercreditor Agreement also expressly stated that Wells Fargo was not obligated to make the loan. After the Intercreditor Agreement was signed, Wells Fargo began to advance the additional funds. The addi-

issued. FmHA regulations define the Conditional Commitment as "FmHA's advice to the lender that the material it has submitted is approved subject to the completion of all conditions and requirements set forth in 'Conditional Commitment for Guarantee.'" 7 C.F.R. § 1980.-6(a)(4).

**2.** In July 1983, AGRI changed its name to High Plains.

**3.** In the 1970s, Southwest National Bank of Wichita made a loan to International Plastics Incorporated for a fluorocarbon plant; this loan was guaranteed by the FmHA. After International Plastics defaulted on the loan, the FmHA purchased the guaranteed portion of the loan. In 1981, AGRI sought to acquire the fluorocarbon plant for conversion to AGRI's planned ethanol plant, and offered to assume the loan on the fluorocarbon plant at a reduced interest rate. The FmHA approved this offer.

tional financing allowed High Plains to resolve the plant's technical problems, and the closing date for the Loan Note Guarantee was set for June 30, 1986.

In December 1985, Wells Fargo formally applied to replace Mid–Kansas as the lead lender. In response to a question concerning High Plains' potential ability to repay their debt, Wells Fargo indicated in their application that "[i]t is difficult to comment on the repayment schedule because of the future fluctuations in the [price] of ethanol and corn...." The FmHA did not respond to Wells Fargo's statement regarding High Plains' ability to repay. In October 1986, Wells Fargo replaced Mid–Kansas as lead lender.

In April of 1986, the FmHA National Office advised its state directors to "immediately" inform lenders holding Conditional Commitments for alcohol production facilities (such as High Plains) that ten additional "items are to be considered in order to assure there is no adverse change in the project prior to their closing of the loan." These additional "adverse change" criteria were a new requirement for the lenders to satisfy. Almost all of the additional items for consideration required the applicant to make a projection concerning the long-term economics of the facility and the ethanol industry.

Wells Fargo was informed of the new requirements on May 29, 1986. Wells Fargo objected to the requirements, and asserted that the new requirements were contrary to discussions held in April 1985 between Wells Fargo and the FmHA. Wells Fargo, in a letter to the FmHA dated June 20, 1986, contended:

[In April 1985, Wells Fargo and the FmHA] entered into a conversation as to what the 'no material adverse change' language meant. I thought we concluded, that although the language was vague and unclear, it did not mean changes in macro economic conditions over which the borrower and the lender has no control. I remember saying we could attempt to get the plant running to specifications, ... but that I had no power to influence oil/ethanol prices or

events in the middle east. I was assured [by FmHA representatives] that was not the intent of the FmHA.

Shortly after sending this letter, Wells Fargo forwarded the final loan documents and requested that the FmHA issue the guarantee. The FmHA refused, and extended the expiration of the Conditional Commitment until July 30, 1986. Shortly before that date, Wells Fargo again forwarded their loan documents for closing. Again, the FmHA did not issue the guarantee, and informed Wells Fargo that a number of items needed to be "clarified, changed or furnished" before the issuance of the Loan Note Guarantee would be considered further.

Subsequently, a number of discussions, both between the parties and within the FmHA, followed over how to interpret the "adverse change" language with respect to world oil and ethanol prices. In an October 31, 1986 letter from the FmHA to Wells Fargo, the FmHA indicated its concern that Wells Fargo "remain[s] unable or unwilling to provide an acceptable certificate relating to no adverse change, financial or otherwise, in the borrower." Apparently, the FmHA was concerned that the project would have insufficient working capital, due to the continuing decline in ethanol prices. The letter also enumerated the outstanding items that FmHA argued prevented them from issuing the guarantee. In response, Wells Fargo stated their position that they, as the lender, were not "intended to bear the risk of changes in external economic factors such as world oil prices." Wells Fargo also responded to the items of concern raised by the FmHA.

The parties continued to exchange correspondence, and, on November 17, 1986, the date for its expiration, the Conditional Commitment was extended to December 19, 1986. In response to the FmHA's concerns that the project had insufficient working capital, on November 18, 1986, Wells Fargo agreed to provide an additional $5 million in financial assistance to the project. Wells Fargo also indicated, with respect to the issue of certification of no adverse change, that they would produce

an "unqualified lender's certificate," and stated, pursuant to a letter to the FmHA, that:

> In making the certification regarding material adverse change, Wells Fargo is comparing the company's ability to repay the loan when the Conditional Commitment was issued in 1982 to their ability to repay the loan today. Wells Fargo believes that there has been no material adverse change based on the company's equity, available working capital management capabilities and based on reasonable projections of commodity prices over the next few years.

The following day, on November 19th, the FmHA National Office Executive Loan Committee (NOEL Committee) met to consider the Wells Fargo proposal. Based in part on the proposed additional financing offered by Wells Fargo, the FmHA indicated that they "were satisfied with the projected economics of this project," although several unresolved details remained. In a memorandum from the Administrator of the FmHA to the Secretary of the Department of Agriculture, the Administrator indicated:

> I have concurred in the issuance of the Loan Note Guarantee to the [High Plains Project]. The lender and borrower have met or have agreed to meet prior to closing of the loan *all conditions* in the Conditional Commitment and, specifically, have met the conditions and requirements in our letter of October 31, 1986, which outlined the conditions that had not been met at that time.

(emphasis in original). On December 8, 1986, the FmHA requested that a number of items be clarified, changed, or furnished, and that these changes be received and approved by the FmHA by December 12, 1986. Changes were received by FmHA personnel on December 13; these documents included an audited financial report of High Plains. This report stated that a number of factors "indicated that High Plains Corporation may be unable to continue in existence," because the ability to exist was contingent on High Plains achieving a level of profitability which, in turn, was dependant on the price of ethanol. On December 17, 1986, FmHA declined to issue the Loan Note Guarantee. This decision was formally made in a December 19, 1986 letter. The two main reasons for the denial were: 1) the audited financial report indicated that, based on the current price of ethanol, High Plains would not generate sufficient cash flow to meet its obligations; and 2) the FmHA had lost confidence in High Plains' management based on what the FmHA viewed as "numerous decisions which have caused adverse consequences."

Wells Fargo appealed the decline of the loan guarantee under FmHA procedures. The hearing took place on May 21, 1987 before the FmHA's state director for Louisiana. The state director did not overturn the FmHA's determination, but did recommend that the FmHA reconsider its refusal to issue the guarantee in light of the improvement in ethanol prices. In July 1987, the Administrator of the FmHA denied Wells Fargo's appeal. Wells Fargo filed its complaint in this court on January 22, 1988.

After hearing oral argument in this case, the court noted that a settlement between the parties would be a particularly practical solution for both parties. This was so because at the time of the argument, the ethanol plant was still operating (and to the court's knowledge, still is) and was financially solvent. The court concluded that the most efficient way to resolve the dispute would be for the government to issue the guarantee, rather than for the parties to litigate the rather complex measure of damages suffered by Wells Fargo. For whatever reason, the parties were not able to settle and the government has not issued the guarantee. Therefore, the court must render this opinion and will proceed to trial on the damages issue.

## DISCUSSION

### I. The Existence of a Contract.

■ The jurisdiction of the Claims Court in this case is conferred by the Tucker Act, which provides that the court is permitted:

> to render judgment upon any claim against the United States founded either

upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491. Defendant asserts that the Claims Court lacks jurisdiction over this case under the Tucker Act because the FmHA did not have a contract with Wells Fargo that would require the issuance of the loan guarantee. Defendant characterizes the Conditional Commitment simply as the FmHA's method of informing the involved parties that their documents submitted at that time had been approved subject to the completion of certain conditions. In the government's view, the Conditional Commitment did not obligate the lender and borrower in any way, because FmHA regulations allow the lender or borrower to notify the FmHA at any time after issuance of the Conditional Commitment that they no longer wish to proceed with the issuance of the guarantee. Therefore, the government also would not be bound. Defendant further argues that, even if contractual consideration had been furnished by Wells Fargo, which the government contests, any consideration would be vitiated by virtue of the fact that a complete escape from the contract existed—Wells Fargo was free to inform the FmHA at any time that they wished to withdraw.

Defendant also argues that, because there was a regulatory framework with which the parties must comply in order for a loan guarantee to issue, there was no "mutual intent" to bind the government to issue the guarantee, because compliance with the requirements was a necessary prerequisite. Defendant further contends that none of the government officials had the authority to bind the United States to issue

the loan guarantee before all the regulatory requirements were satisfied.[4]

The court disagrees with the contentions of the government. The court finds that the FmHA's Conditional Commitment and the Intercreditor Agreement were conditional contracts to issue a Loan Note Guarantee, and the existence of the Conditional Commitment and the Intercreditor Agreement induced plaintiff to make loans it otherwise would not have made. The court finds that the Conditional Commitment constitutes a unilateral contract, where one party makes a promise as consideration for the contract, and the contract is deemed to be accepted when the other party begins performance. "There is ample case law holding that a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon." *National Rural Utilities Cooperative Finance Corp. v. United States*, 14 Cl.Ct. 130, 137 (1988), *aff'd*, 867 F.2d 1393 (Fed.Cir.1989), *citing Himfar v. United States*, 355 F.2d 606, 174 Ct.Cl. 209, 214–15 (1966); *Padbloc Co. v. United States*, 161 Ct.Cl. 369, 378–79 (1963); *Radium Mines, Inc. v. United States*, 153 F.Supp. 403, 139 Ct.Cl. 144, 147–48 (1957). *See also Grav v. United States*, 14 Cl.Ct. 390, 393 (1988), *aff'd*, 886 F.2d 1305 (Fed.Cir.1989). Thus, where a unilateral contract is at issue, the fact that only one party has made a promise does not imply that a contract does not exist. A contract comes into existence as soon as the other party commences performance.

Pursuant to the Conditional Commitment, the FmHA offered to guarantee financing if the conditions set forth in the Conditional Commitment were met. Wells Fargo began performance by advancing $20 million for construction of the ethanol

---

4. Under *Deakins v. United States*, 3 Cl.Ct. 97 (1983), the FmHA officials must have been acting within the scope of their authority. Defendant argues that issuing a loan guarantee was not within the scope of the authority of the FmHA officials who signed the Conditional Commitment. However, the issue at this point is not whether these officials had the authority to grant a guarantee, but whether these officials had the authority to obligate the FmHA to a

Conditional Commitment. Defendant does not argue that the FmHA officials lacked authority to sign the Conditional Commitment or the Intercreditor Agreement. Defendant's failure to proffer any evidence of or basis for such an absence of authority defense indicates that "FmHA officials [were] acting within the scope of their authority" when they issued the Conditional Commitment and the Intercreditor Agreement. 3 Cl.Ct. at 101.

plant. Wells Fargo and High Plains worked together to complete a fully operational ethanol plant. The court holds that, even prior to the September 9, 1985 Intercreditor Agreement, the FmHA could not have withdrawn its offer to issue a Loan Note Guarantee subject to the conditions, since, by investing funds in the project in reliance on the FmHA's offer to issue the guarantee, plaintiff had already begun performance. It is basic hornbook law that, where an offer invites an offeree to accept by rendering a performance, the contract is created when the offeree "tenders *or begins* the invited performance." Restatement (Second) of Contracts § 45 (emphasis added). While the FmHA was not legally obligated to issue the guarantee when plaintiff commenced performance, it was obligated to give the plaintiff a reasonable chance to meet the required conditions, and if plaintiff did meet the conditions, to issue the guarantee. "[W]here no time limit is given, it is presumed that performance will be completed within a reasonable time." *Societe Anonyme des Ateliers Brillie Freres v. United States*, 160 Ct.Cl. 192, 201 (1963). It follows that, if no time limit for performance is contained within the contract, the offeror must allow the offeree a reasonable time under the circumstances within which his performance may be rendered. Thus, by loaning High Plains $20 million for construction of the ethanol plant in reliance on the Conditional Commitment, Wells Fargo commenced performance and a contract was formed.

In addition to the Conditional Commitment, the Intercreditor Agreement also constitutes a contract. As discussed above, in 1984, Wells Fargo and High Plains determined that an additional $3.5 million would be necessary to allow the plant to produce ethanol at full capacity. Before Wells Fargo agreed to advance the additional funds, and after months of negotiation, Wells Fargo, High Plains, and the FmHA signed the Intercreditor Agreement. The agreement stated that the parties entered into the agreement, *inter alia*, "to induce Wells Fargo to consider" loaning

High Plains the additional $3.5 million. As the Intercreditor Agreement indicated, Wells Fargo intended, through its additional investment, to "cause the FmHA Guarantee to be issued." The Intercreditor Agreement called for the issuance of the Loan Note Guarantee "upon compliance with the conditions of the commitment and FmHA regulations."[5] The court finds that the language of the Intercreditor Agreement and the actions of the parties indicate that a contract existed between the parties. Under that agreement, the FmHA would be obligated to issue the Loan Note Guarantee once the conditions were satisfied. Pursuant to the Intercreditor Agreement, plaintiff advanced High Plains the $3.5 million to modify the plant. The court finds that the Conditional Commitment and the Intercreditor Agreement constitute contracts that bind the FmHA to issue the guarantee if the conditions were satisfied. The FmHA was not free to withdraw its offer or to refuse to determine if the conditions were, in fact, satisfied.

This subject is not one of first impression for this court. A Conditional Commitment was found to embody a contractual relationship in *Deakins v. United States*, 3 Cl.Ct. 97 (1983). In *Deakins*, the Conditional Commitment was found to be:

> an agreement between the plaintiff and the government, reflecting a considerable amount of negotiation and communication, which was signed by the FmHA officials acting within the scope of their authority. Under the agreement plaintiff was induced to build homes by the promise that if homes were built in accordance with FmHA requirements, low interest loans would be made available by the government to eligible purchasers.

3 Cl.Ct. at 101. Although the *Deakins* court ultimately concluded that the government had not breached its contract because the plaintiff failed to satisfy FmHA requirements, the court's conclusion that a Conditional Commitment was evidence of a contractual relationship supports a similar legal conclusion here.

---

**5.** There is no dispute between the parties as to regulatory compliance.

The defendant attempts to distinguish *Deakins* by arguing that *Deakins* involved FmHA "Rural Housing Loans," not FmHA "Business and Industrial Loans." The Rural Housing Loan program required payment of a fee in order to apply for a conditional commitment. The court does not find this distinction persuasive. The government further argues that this court should follow the Seventh Circuit's opinion in *Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1054 (7th Cir. 1988). In that case, the mortgage company issued a "commitment" letter to the purchaser of a hotel for a loan. The court indicated that the commitment letter constituted the mortgage company's agreement to make the loan *subject to a number of conditions*, and thus was not a binding obligation. *Id.*

The court finds *Runnemede* inapplicable under the facts of this case. In *Runnemede*, the mortgage company only bound itself to *consider* making the loan once the conditions were satisfied. Here, in contrast, the language of the Conditional Commitment clearly states that the FmHA "will execute" the Guarantee once the conditions are met. There is significantly less discretion—if indeed, there is any discretion at all—on the part of the FmHA to issue the loan guarantee once the conditions have been satisfied than there was in *Runnemede*. In addition, in *Runnemede*, the court did not find that plaintiff had taken any action in reliance on the letter. In contrast, here plaintiff advanced millions of dollars, both in reliance on the Conditional Commitment and on the Intercreditor Agreement.

In concluding that the Conditional Commitment was a contract, the court in *Deakins* relied upon the fact that the FmHA's promises induced the plaintiff to act. Similarly here, the FmHA promised to issue a guarantee upon satisfaction of the conditions in the Conditional Commitment; this promise induced Wells Fargo to make loans it otherwise would not have made. Former FmHA Business and Industrial Loan Program Director John Swinnea stated in his deposition, "[t]he purpose of the lender program is to get banks to make loans they otherwise wouldn't make." In former FmHA Administrator Vance Clark's deposition, he agreed that if plaintiff did "indeed meet the conditions of that commitment, we are legally bound to make that guarantee and we were required to do it." Based on the unilateral contract between the parties, if those conditions are satisfied, the FmHA must issue the loan guarantee or be in breach of its contract.[6]

## II. The "Adverse Change" Language.

■ As discussed earlier, the language of the Conditional Commitment provided that:

> A Loan Note Guarantee will not be issued until the Lender certifies that it has no knowledge of any adverse change, financial or otherwise, in the Borrower, his business, or any parent, subsidiaries, or affiliates since it requested a Loan Note Guarantee.

The court finds that this requirement of "no adverse change" does not apply to conditions outside an applicant's control for which the applicant has not assumed the risk. This interpretation is consistent with the congressional intent of the ethanol loan guarantee program, as well as the long-recognized desire of out legal system to avoid forfeiture where possible.

### A. *Legislative Intent*

An examination of the congressional purpose for the ethanol loan guarantee program is helpful in ascertaining the context within which the 1982 Conditional Commitment, containing the "adverse change" language, was drafted. The ethanol loan

---

6. Because of the court's conclusion that a contract existed between the parties, it is not necessary to reach the plaintiff's equitable estoppel argument. That argument, set forth in count IV of the complaint, contends that the FmHA acted to cause Wells Fargo to believe that a Loan Note Guarantee would be issued, and therefore, that the FmHA should be estopped from denying its obligations to issue the guarantee. However, even if the court had concluded that no contract existed, summary judgment on the estoppel claim would be inappropriate as a factual inquiry would be necessary.

guarantee program under the Consolidated Farm and Rural Development Act sought to achieve specific social goals, including the development of alternative, renewable energy sources; the creation of an enlarged grain market; and the promotion of increased employment in rural areas. The uncertain economic viability of ethanol, and particularly, ethanol's inability to be price competitive unless crude oil prices rose, caused private lenders to deny loans for the construction of ethanol plants. To combat the lack of investment, Congress provided economic incentives to lending institutions by guaranteeing 90% of the financing.

The economic uncertainty in the ethanol industry is precisely what necessitated the loan program that was designed to attract financing that would be unavailable under normal commercial terms. It follows that, if lender banks, rather than the government, were to bear the risk that uncertain ethanol prices might affect a plant's cash flow which would prevent the loan guarantee from being issued, lenders would be just as unlikely to issue the loans as they would be in the absence of the federal loan guarantee program. If the FmHA did not assume at least some of the risk of the unstable market, the loan guarantee program would not offer any incentive for lenders to advance ethanol loans. If the FmHA did not bear the risk of a weak, worldwide ethanol market, then it bore no risk at all. The government's position in this case would undercut the legislative rationale for the ethanol program.

Under the government's interpretation of "adverse change," the FmHA would only be required to issue a loan guarantee if the ethanol market were sound; this, however, would be a meaningless gesture because a lender would presumably not need a guarantee if the ethanol market was flourishing. Lenders were not making ethanol loans on their own because the market was unstable. It is implicit that a lender would only make an ethanol loan if it was guaranteed against the acknowledged instability of the ethanol market. The government's interpretation of the "adverse change" language thus cannot be correct.

## B.  *Avoidance Of Forfeiture*

The April 16, 1986 memorandum from the FmHA Administrator directed FmHA state directors to consider world ethanol and oil prices when determining whether any adverse change had occurred, and listed ten items for consideration in determining "adverse change." Prior to this, there was no indication of what factors would be considered in determining "no adverse change." The April memorandum was written after plaintiff had advanced the initial $20 million loan.

█ Under the FmHA's interpretation of adverse change, the FmHA could avoid guaranteeing the loan because of the occurrence of events beyond plaintiff's control, such as the existence of low ethanol prices. Thus, the FmHA's interpretation could lead to a forfeiture by a fully-performing party. Contract provisions that condition a duty on the occurrence of an event are properly interpreted to reduce the risk of forfeiture, unless the party at risk of forfeiture clearly assumed the risk that the condition would not be fulfilled:

> In resolving doubts as to whether an event is made a condition of an obligor's duty, ... an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.

Restatement (Second) of Contracts, § 227(1) (1981). Comment c to § 227(1) further explains that "[w]here the language is doubtful, an interpretation is generally preferred that will avoid" the risk of forfeiture. A party risks forfeiture if the nature of the condition is such that uncertainty is not likely to be resolved until after the obligee has performed. Restatement (Second) of Contracts § 227(1) (comment b). An interpretation resulting in forfeiture is particularly disfavored when the purportedly unfulfilled condition is outside the control of a party who has already performed. "If the event is within [the obligee's] control, he will often assume the risk. If it is not within his control, it is sufficiently un-

usual for him to assume the risk that, *in case of doubt, an interpretation is preferred under which the event is not a condition." Id.* (emphasis added). *See also Bank of Advance v. United States,* 6 Cl.Ct. 535, 538, n. 3 (1984) (court prefers interpretation that reduces the risk of forfeiture).

■ The plaintiff clearly did not assume the risk of low ethanol prices. The Conditional Commitment did not specify that the loan guarantee was contingent upon high ethanol prices or upon a healthy world ethanol market. Low ethanol prices were "a reasonably foreseeable event given the climate" of the ethanol industry in the 1980s. The FmHA could have structured the Conditional Commitment to shift the risk of an uncertain ethanol market to the plaintiff by defining "adverse changes," but this was not done.

The FmHA's interpretation in 1986 of what would constitute an adverse change led to a forfeiture by plaintiff. By interpreting the Conditional Commitment's "adverse change" language to exclude changes in macroeconomic conditions beyond plaintiff's control, such a forfeiture can be avoided. Thus, the FmHA cannot deny an ethanol loan guarantee, pursuant to the "adverse change" provision of the 1982 Conditional Commitment, on the basis of low ethanol prices, weak oil or ethanol markets, or any other similar condition that is beyond plaintiff's control and for which the plaintiff did not assume the risk.

III. The Contractual Obligations.

■ The remaining issue is whether plaintiff satisfied the conditions of the contract, thereby making the FmHA's failure to issue the Loan Note Guarantee a breach of the contract. As discussed earlier, in October 1986, the FmHA expressed its concern that the project would have insufficient working capital, due to the decline in ethanol prices. In response to the FmHA's concerns, on November 18, 1986, plaintiff agreed to provide High Plains an additional $5 million of financial assistance to insure that the plant had an adequate cash flow. This $5 million cash infusion was intended to alleviate the FmHA's concerns. Apparently it did, because on November 19, 1986 the FmHA National Office Executive Loan Committee (NOEL Committee) agreed to accept plaintiff's certification that there had been no adverse change, and, on November 26, FmHA Administrator Vance Clark wrote plaintiff that "[i]f Wells Fargo provides such additional assistance, then FmHA is satisfied with projected economics of this project." Also on November 26, Administrator Clark informed Department of Agriculture Secretary Richard Lyng that plaintiff had satisfied all conditions to the guarantee that existed as of October 31, 1986:

> The lender and borrower have met or have agreed to meet prior to closing of the loan *all conditions* in the Conditional Commitment and, specifically, have met the conditions and requirements in our letter of October 31, 1986, which outlined the conditions that had not been met at that time. . . .
>
> . . . .
>
> As you well know, I have been very reluctant to approve the 1982 commitment and would not do so until *all* commitment requirements were met. The cash flow requirement was, of course, primary and their $5 million cash infusion has assured that.

(emphasis in original). In addition, Administrator Clark wrote a letter to Congressman Coelho of California on December 3rd, notifying him that the efforts of all concerned parties "are now culminating in the granting of the guarantee," and that the FmHA was now "able to ... legally issue the guarantee." In spite of these actions, however, the FmHA refused to issue the loan guarantee on December 17th, less than one month after this correspondence.

On December 19th, the FmHA sent a letter to Wells Fargo stating that the guarantee would not be issued, and indicating that their decision was based on the fact that "an adverse change in the financial condition of High Plains Corporation during the period of time between the issuance of the Conditional Commitment for Guarantee in 1982 and December 17, 1986" had

occurred. Two reasons were given by the FmHA to support their decision. First, the FmHA relied on an audited report from the accounting firm Peat, Marwick, Mitchell and Company that indicated that, based on the low price of ethanol and the high cost of milo (a type of grain), High Plains would not be able to generate sufficient cash flow to meet its obligations. Second, the FmHA contended that they had lost confidence in the management of High Plains due to numerous management decisions with adverse results. Eight examples to support this latter contention were given:

a. The Environmental Protection Agency brought suit against High Plains. The court imposed a fine on High Plains in 1985 as a result of that suit.

b. The audited financial report indicated net losses for 1984, 1985, and 1986. Ethanol prices for those years were at a level where other ethanol producers were profitable.

c. Although the plant was scheduled to go into full production in 1984, the plant was unable to reach designed capacity until April 1986.

d. Numerous extensions of the Conditional Commitment were made at the request of High Plains.

e. Concerning access to the plant, High Plains merely possessed a one-year renewable right of ingress and egress with a limited right to renew, instead of clear ownership of access as initially claimed.

f. Corporate cash flows inaccurately reflected the terms of the $20 million loan agreement and note.

g. In preparing for closing, it was revealed that several unanticipated obligations (approximately $550,000) of High Plain's would have to be paid from the loan proceeds.

h. Since issuance of the Conditional Commitment in 1982, High Plains incurred substantial unanticipated new debt and would need to incur further new debt immediately.

The government has indicated that the December 19, 1986 letter contains all the reasons for the denial of the guarantee.

As discussed above, defendant may not refuse to issue the guarantee based on conditions outside plaintiff's control for which the plaintiff did not assume the risk of forfeiture. Therefore, defendant's first reason for denying the guarantee, insufficient cash flow due to low ethanol prices, is not a legally sufficient reason. Therefore, the FmHA's denial of the guarantee must rest on the second reason offered by the FmHA—the High Plains management problems. The court concludes that the eight reasons provided by the FmHA to support their allegation of poor management by High Plains are not a sufficient basis to demonstrate that High Plains had suffered an adverse change under the contract. The court finds that the eight reasons enumerated in the December 19th letter do not constitute grounds for the FmHA's refusal, because the reasons were known prior to the signing of the Intercreditor Agreement and prior to the approval by the NOEL Committee.

Plaintiff points out that every example of poor management given in the December 19th letter, with the possible exception of certain fees, had been known by the FmHA when the NOEL Committee and Administrator Clark indicated their approval of the guarantee in November. In addition, many of the eight reasons offered by the FmHA in the December 19th letter to support its decision occurred prior to the signing of the Intercreditor Agreement on September 9, 1985. For example, the fine imposed as a result of the suit by the Environmental Protection Agency was levied against High Plains in 1985. In addition, the fact that the plant did not go into full production in 1984 due to operational and environmental problems clearly was known in September 1985. Finally, plaintiff contends, and the government does not dispute, that two of the remaining reasons—the form of payment on the loan guarantee and additional obligations that would be required to be paid from loan proceeds—had also been known to the FmHA prior to the signing of the Intercreditor Agreement. Concerning the additional obligations, plaintiff points out that $180,000 of those obligations represent the FmHA's *own* guarantee fee.

These enumerated reasons cannot support the FmHA's decision to refuse to issue the loan guarantee because they did not prevent the FmHA from signing the Intercreditor Agreement. Despite being aware of these "adverse" conditions, the FmHA executed the Intercreditor Agreement in the Fall of 1985, pursuant to which plaintiff advanced an additional $3.5 million.

The court does not find convincing or legally sufficient the remaining reasons offered in the December 19th letter. The "unanticipated new debt" cited by the FmHA in the December 19th letter as further evidence to support its decision to deny the guarantee *was the additional $3.5 million that the FmHA induced Wells Fargo to loan through the Intercreditor Agreement!* To accept such reasoning would be like the court shooting a plaintiff's parents and then denying him relief because he was an orphan, to paraphrase an old joke. Thus, it appears that the FmHA signed the Intercreditor Agreement to induce the plaintiff to provide additional funding to High Plains, only to later claim that the existence of that additional debt was a reason to deny the guarantee. FmHA-induced debt can not constitute an adverse change. Defendant is at best disingenuous in this "reason." Similarly, the extensions of time for the Conditional Commitment were agreed to by the FmHA, and thus can not be counted against the plaintiff.

The FmHA's concern about the possibility of High Plains losing road access to the plant rings hollow. Access to the plant was available through two sources. The one referred to by the FmHA was created through a license agreement with Kansas Gas & Electric. High Plains entered into the license agreement to avoid the cost of paving the other source of access. When it was discovered in December 1986 that High Plains did not own the land over which the other access road would travel, High Plains arranged to purchase the land from the actual owner. Defendant did not rebut the fact that on December 16th, one day before the proposed day of the loan guarantee closing, the owner of that property was ready and willing to sell High Plains the land. Since defendant did not successfully rebut plaintiff's assertion that the access problem could easily have been resolved, and would have been resolved if the parties had gone through with the loan guarantee closing, that fact cannot be a valid reason for denying the guarantee.

Another reason offered by the FmHA was the evidence contained in the 1986 audited financial report which indicated that High Plains had experienced net losses in 1984, 1985, and 1986. However, an analogous situation existed prior to the signing of the Intercreditor Agreement. The 1984 audited financial report concluded that High Plains had incurred a net loss of $2.3 million during the year ending June 30, 1984, and indicated that High Plains "may be unable to continue in existence." In spite of this, the FmHA was willing to sign the Intercreditor Agreement. The FmHA certainly knew that High Plains had suffered losses in 1984 and 1985 when it signed the Intercreditor Agreement.

Furthermore, on December 17th, the day the guarantee was denied, the FmHA drafted a rejected notice on a standard FmHA form stating that the guarantee had been denied: 1) because there had been an adverse change in High Plains' financial condition; and 2) because High Plains had inadequate working capital and resources. The "serious concerns about the credibility of [High Plains] management," which was one of the two reasons for refusing to issue the guarantee given in the December 19th letter, did not even appear in the December 17th FmHA draft rejection form. None of the eight items listed in support of the second reason in the December 19th letter were included in the December 17th form. Notwithstanding the fact that FmHA regulations call for a denial to be sent on this standard FmHA rejection form, 7 C.F.R. § 1980.61(e) (1986), the FmHA did not send the rejection form but instead sent the December 19th letter.

The court finds no evidence to prove that High Plains had suffered an adverse change. The evidence offered by the FmHA in the December 19th letter to support their allegation of poor management

by High Plains does not support a finding that an adverse change had taken place. Most factors cited by the FmHA were known prior to the FmHA entering into the Intercreditor Agreement and prior to the FmHA indicating informally that the guarantee would be issued. Because the cited reasons did not prevent the FmHA from entering into the Intercreditor Agreement or from informally approving the issuance of the guarantee, they cannot be sufficient reasons for refusing to issue the guarantee. In addition, the FmHA may not deny the guarantee based on conditions outside the control of plaintiff for which the plaintiff did not assume the risk of forfeiture—for, example, low ethanol prices. The court finds that, because the conditions contained in the Conditional Commitment were met, the government breached its contract to issue the loan guarantee.

## IV. Plaintiff's *Quantum Meruit* Claim

■ In Count III of its complaint, Wells Fargo claims that it is entitled to recover payments made in connection with the defaulted fluorocarbon plant loan insofar as those payments were made at plaintiff's expense. Plaintiff characterizes this claim as one for unjust enrichment—"a *quantum meruit* claim ... on a contract implied-in-fact." Wells Fargo argues that payments on the defaulted loan were made in anticipation of the loan guarantee being issued, and that the FmHA was unjustly enriched through receipt of these payments.

■ In order for the court to find an implied-in-fact contract between the parties, there must have been a meeting of the minds of the parties to the contract, which is inferred from the parties' conduct such that a "tacit understanding and agreement" was reached. *Fincke v. United States*, 675 F.2d 289, 230 Ct.Cl. 233, 244 (1982) (citation omitted). Defendant argues that, in order for an implied-in-fact contract to exist here, plaintiff would need to show that an agreement existed between Wells Fargo and the FmHA that Wells Fargo should recover from the FmHA the payments made by High Plains to the Kansas bank which had issued the FmHA-guar-

anteed loan. Defendant contends, and the plaintiff does not dispute, that plaintiff did not show that an implied-in-fact contract existed. At most, plaintiff could argue that a contract implied-in-law exists. An implied-in-law contract is a fiction created by the court to provide an equitable remedy and does not take into consideration the intention of the parties. Instead, the court imposes a quasi-contractual obligation on the parties to bring about justice.

The court declines to reach the issue of whether an implied-in-law contract existed, because although the Claims Court possesses jurisdiction over implied contracts pursuant to the Tucker Act, 28 U.S.C. § 1491, that jurisdiction has been construed to apply only to contracts implied-in-fact and not to contracts implied-in-law. *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983). Thus, a suit based on a theory of *quantum meruit* or unjust enrichment is a suit based on a contract implied-in-law, and the Claims Court does not possess jurisdiction over such claims. *See, e.g., United States v. Mitchell*, 463 U.S. at 208, 103 S.Ct. at 2963; *Fincke v. United States*, 675 F.2d at 296–97, 230 Ct.Cl. at 246–47. Therefore, the defendant's motion for summary judgment with respect to count III of the complaint is granted.

## CONCLUSION

The 1982 Conditional Commitment and the Intercreditor Agreement constitute contracts between Wells Fargo and the government. With respect to the language of the Conditional Commitment which required the lender to certify that no "adverse change" had occurred in the borrower, that language is inapplicable to conditions outside a lender's control for which the lender did not assume the risk. Plaintiff fulfilled its contractual obligations, and the defendant refused to issue the loan guarantee. Such refusal to issue the guarantee constituted a breach of the contract.

For the reasons set forth above, the government's motion for summary judgment is DENIED, except insofar as it addresses plaintiff's *quantum meruit* claim.

The plaintiff's motion for partial summary judgment is GRANTED with respect to the existence and breach of the contract.

The parties are ordered to file a joint status report within 60 days of the issuance of this opinion addressing further proceedings in this case, including those proceedings necessary to resolve the issue of the appropriate amount of monetary damages to be awarded.

IT IS SO ORDERED.